

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-8-1998

# Atacs Corp v. Trans World Comm Inc

Precedential or Non-Precedential:

Docket 97-1812,97-1813

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Atacs Corp v. Trans World Comm Inc" (1998). *1998 Decisions.* Paper 217.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/217

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 8, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-1812 & 97-1813

ATACS CORPORATION; AIRTACS CORPORATION,

        Appellants in 97-1812

v.

TRANS WORLD COMMUNICATIONS, INC.,

        Appellant in 97-1813

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 92-cv-05064)

Argued: June 5, 1998

Before: SCIRICA, NYGAARD and SEITZ, Circuit Judges

(Opinion filed: September 8, 1998)

        Mark A. Dombroff (Argued)
        Courtney R. Bateman
        DOMBROFF & GILMORE
        1025 Thomas Jefferson Street, NW
        Suite 300 West
        Washington, DC 20007
        Attorneys for Appellants/Cross
        Appellees

          Barbara W. Mather (Argued)
          Robert L. Hickcok
          L. Suzanne Forbis
          Matthew J. Hamilton
          PEPPER HAMILTON LLP
          3000 Two Logan Square
          Eighteenth & Arch Streets
          Philadelphia, PA 19103-2799
          Attorneys for Appellee/Cross
          Appellant

OPINION OF THE COURT

SEITZ, Circuit Judge.

This appeal and cross-appeal primarily present two novel issues for review. The first question is whether the parties entered into a legally enforceable "teaming agreement." If the answer is in the affirmative, we must address how to calculate, if at all possible, the damage resulting from a breach of that agreement. The district court exercised diversity jurisdiction pursuant to 28 U.S.C. S 1332, and our jurisdiction arises under 28 U.S.C. S 1291 to consider the district court's final orders. The parties agree that the substantive contract law of Pennsylvania governs the issues raised in this case.

I. Factual Background

A. The Parties and Related Entities

For the most part, the parties do not dispute the relevant facts as described by the district court in its detailed findings of fact set forth on May 28, 1997 after a bench trial. To summarize, ATACS Corporation and AIRTACS Corporation ("plaintiffs") engaged in the business of integrating or customizing mobile enclosures with communications or other equipment for military use. Trans World Communications ("defendant") is a subsidiary of Datron, Inc., a publicly traded company. Defendant engages in designing, manufacturing, and selling of high frequency

2

radio equipment into communications shelters and for other uses.

B. The Greek Request for Proposal and
the Parties' Agreements

The history underlying the transactions subject to dispute in this case begins in October of 1989, when the Greek government opened bidding to manufacture 61 communication shelters for the Hellenic Army General Staff. A Request for Proposal ("RFP") prepared by the Greek government outlined various specifications for the communications shelters as well as certain financial requirements for all bidders. Plaintiffs considered bidding on the contract as the prime contractor, but they lacked the requisite assets to meet the financial obligations enumerated in the Greek RFP. Defendant also investigated bidding on the project as prime contractor, but it did not command significant technical experience in this particular field and generally lacked foreign government contracting knowledge to bid and perform the contract on its own.

Given the comparative strengths of the parties, a strategic alliance was born on February 26, 1990, where defendant wrote plaintiffs stating that "[t]his letter will serve as confirmation that Trans World Communications intends to team with ATACS Corporation on the Greek Shelter program." App. at 1671. While defendant professed that the "details need[ed] to be worked out," and that "this [letter] is only a preliminary look at our various responsibilities," defendant sought a commitment from plaintiffs before any quotations were issued. Id. Further discussions proved fruitful, and the parties agreed that defendant would bid for the Greek RFP as the prime contractor and plaintiffs would be the major subcontractor. App. at 1913. By April 25, 1990, defendant communicated to plaintiffs a basic outline for the new arrangement whereby defendant agreed to assume the role of prime contractor, assume complete responsibility for the financial requirements of the Greek RFP, and give plaintiffs a subcontract for the shelter and generator systems. In return, plaintiffs were expected to "assist in the final proposal preparation," submit a price quotation on their portion of the program, and introduce

3

defendant to their Greek agent who would facilitate the bid. App. at 1913. The parties agreed to circulate a draft contract and initiate the process of formalizing this agreement.

For the next three months, the parties circulated draft subcontracts, none of which were executed. In the exchange of drafts, however, the parties had substantially agreed to the basic understanding of the transaction. In particular, the parties agreed that:

> 1. Transworld will be the Prime Contractor and will assume complete responsibility for the Program including any Letters of Credit which may be required. ATACS will be a sub-contractor to Transworld and will be responsible for the shelters and generators.1
>
> 2. Axon Inc. will be the sole agent for this program. ATACS will introduce Transworld to Axon May 1, 1990 . . . .2
>
> 3. ATACS has accomplished significant work developing a Technical Proposal. In addition, ATACS has also reviewed the agent's Consulting Agreement and the Offset Agreement. This information will be made available to Transworld. Transworld will reimburse ATACS for their cost associated with our Technical Proposal and for legal expenses associated with the review of Offsets and Consulting Agreements.3
>
> 4. ATACS will submit a quotation to Transworld for the shelters and generators. It is agreed that Transworld will flow down to ATACS no less favorable payment terms and conditions than it

_____

1. The later documentation reflects that the parties had agreed to give defendant an option to purchase the generators directly. Defendant exercised this option and accordingly plaintiffs' eventual proposal did not include generators.

2. Axon Inc. is plaintiffs' agent in Greece that would facilitate defendant's bid for the Greek RFP.

3. The parties agreed that any reimbursement for ATACS' services under this provision would be built into the proposal submitted to defendant.

4

receives from the Greek Government. ATACS will in turn flow down these same terms and conditions to its Prime vendors.

5. ATACS agrees to work exclusively with Transworld on this project. Transworld agrees to work exclusively with ATACS relative to the ATACS Scope of Work set forth in paragraph 1 above.

. . . .

7. ATACS agrees to assist Transworld as needed in the final proposal preparation.

App. at 1914-15; see also App. at 1948-49, 1966-69, 2047-50, 2059-62. In accordance with their understanding, plaintiffs introduced defendant to their Greek agent who ultimately proved to be influential in getting defendant the final contract.

After more draft subcontracts and price quotations, none of which were executed by the parties, plaintiffs submitted their final price proposal to defendant, which totaled approximately $3.8 million. On July 16, defendant submitted its own proposal to the Greek government. As the prime contractor bidding for the Greek RFP, defendant represented that plaintiffs would be "the primary subcontractor in our proposal," as well as a member of the "team" working on the project. App. at 2144-45. It is not disputed on appeal that defendant included in its bid plaintiffs' final prices plus a 30% profit margin.

C. Post-Submission Conduct

Several months after the submission of the bid for the Greek RFP, defendant learned that its proposal for the project remained competitive. Nevertheless, in early December of 1990, defendant contacted Craig Systems ("Craig"), a manufacturer of bare shelters, shelter integrator, and competitor to plaintiffs. When Craig expressed an interest in performing the shelter integration work on the Greek project -- the same work that had been promised to plaintiffs -- defendant sent to Craig all of the information, design notes, general correspondence, and plaintiffs' technical proposal regarding the Greek RFP.

5

Defendant then asked Craig to submit a bid for the shelter work, and Craig ultimately submitted its final proposal and price quotation in late January of 1991.

On January 24, 1991, plaintiffs' Greek agent forwarded defendant the results of the Greek government's review of the various bids, which indicated that the defendant's bid was the lowest among the competitors. Although defendant at this point was confident that it would win the contract, it realized that the final award would require further negotiations with the Greek government.4  For the next several months, defendant negotiated with Greek authorities to determine the final technical specifications and price concessions. Then, on May 13, 1991, defendant sent all its potential subcontractors, including plaintiffs, a form letter which stated:

> We have recently been called by the Greek government to negotiate the final terms and conditions for this shelter contract. Therefore, we ask that your firm please REQUOTE YOUR OFFER to us as soon as possible, and extend the quote validity date to at least August 31, 1991.
>
> . . .
>
> . . . All outside vendor equipment and service is being bid in a competitive environment and Trans World will chose the supplier, based on the price of goods, quality, service and technical/manufacturing capabilities.

App. at 2413 (emphasis in original). On the same date, defendant sent plaintiffs another letter which,"encourage[d] you to make your bid as competitive as possible. While we were encouraged in our earlier preliminary discussions by

_____

4. Apparently, negotiations between the government and contractors even after the unsealing of the bids are typical in thisfield of government contracting. See Air Tech. Corp. v. General Elec. Co., 199 N.E.2d 538, 543 (Mass. 1964); Brent E. Newton, Note, The Legal Effect of Government Contractor Teaming Agreements: A Proposal for Determining Liability and Assessing Damages in Event of Breach, 91 Colum. L. Rev. 1990, 1995 n.25 (1991); W. Noel Keyes, Government Contracts in a Nutshell 137–69 (2d ed. 1990).

the cost estimates you provided us for planning purposes, your later formal proposal was disappointingly high and was not competitive with other proposals which we have received." App. at 2412. This letter was thefirst communication to plaintiffs by defendant indicating that defendant had in fact been soliciting other proposals for the shelter integration and air conditioning portions of the project. It was also the first time plaintiffs had learned that defendant considered plaintiffs' proposal "disappointingly high," even though defendant's bid for the Greek RFP was the lowest of all bidders.

Shocked at defendant's position, plaintiffs responded to these letters by confirming the validity of their price proposals submitted on June 28, 1990. Although plaintiffs indicated that they were "not and never have been unwilling to discuss with you an equitable adjustment to our proposed pricing if such an adjustment is required in obtaining the award," App. at 2432, they emphasized that "[t]here was an agreement between Trans World and ATACS that ATACS would be the sole source shelter integrator and supplier, and . . . AIRTACS [would be the] sole source provider of air conditioners . . . ." App. at 2414. Defendant did not respond to plaintiffs' letters or other attempts at communication.

By December 11, 1991, defendant completed negotiations with the Greek government and executed a contract in the amount of $23,006,319, which closely corresponded to the original bid from defendant, absent minor adjustments to hardware, training, and technical specifications. Nearly a month later, defendant sent another letter to potential subcontractors, including plaintiffs, explaining the technical changes and requesting an updated quote on the revised shelter design specifications. While plaintiffs did not respond, defendant received quotations from three other companies, including Craig, for the shelter integration work. These proposals quoted prices significantly lower than plaintiffs' final price quote, and included proposals for bare shelters, which was not included in the plaintiffs' package. Defendant ultimately executed subcontracts with Craig for the shelter integration work and Airflow for the air conditioner portion of the project. The total price difference

between the Craig/Airflow contracts and the plaintiffs' proposals totaled $1,887,104.

D. The District Court's Disposition

In response to these events, plaintiffs sued defendant in the district court, alleging breach of contract, detrimental reliance, misrepresentation, wrongful interference with prospective contractual relations, and unjust enrichment. After a bench trial, the district court found that the "teaming arrangement" between defendant and plaintiffs constituted an enforceable contract with sufficiently definite terms for enforcement, notwithstanding the absence of a final executed document evincing the parties' agreement. The district court relied on the outward manifestation of the parties' intent to conclude that the terms of the legally binding agreement between defendant and plaintiffs entailed a promise by defendant to work exclusively with plaintiffs in its bid for the Greek RFP, and to further negotiate in good faith the final subcontract prices if the Greek government awarded defendant the prime contract. In return, plaintiffs promised defendant to assist in the preparation of its bid, to work exclusively with defendant, and to introduce defendant to its Greek contacts. The district court further found that the parties did not agree on the price of the subcontract, nor did they come to an agreement regarding any fees plaintiffs would receive for their services.

Given these terms of the contract, the district court found defendant in breach of contract when it did not work exclusively with plaintiffs in arriving at a final price agreement for the subcontract. Moreover, the court found that defendant's conduct after the Greek government awarded it the project did not constitute good faith negotiations with plaintiffs. This, the could held, also constituted a breach of the teaming agreement between the parties.

Accordingly, the district court next considered what form of damages would appropriately compensate plaintiffs. While the district court recognized that expectation damages, measured in lost profits, ordinarily applies under

8

Pennsylvania law, it found that such a calculation, if attempted, would lead to mere speculation because the parties never agreed on a price for plaintiffs' subcontract. Similarly, the district court felt unable to compute lost opportunity damages because the plaintiffs had not submitted sufficient evidence showing that the parties would have come to an agreement on price given the different positions on various financing fees, and the enormous difference between plaintiffs' final price and the ultimate bid submitted by Craig. It therefore held that plaintiffs could not receive lost profits as a remedy for breach of contract.

Next, the district court considered whether restitution or reliance damages were appropriate, and submitted the question to the parties for further briefing. With respect to restitution, plaintiffs argued that the value of its services rendered to defendant roughly approximate the $1,288,349 defendant had paid in consulting fees to plaintiffs' Greek agent. The district court rejected that argument because it found the consulting services provided by plaintiffs' own Greek agent differed substantially from the technical services provided by plaintiffs. Because the district court felt that it had no reasonable basis in calculating the value of plaintiffs' service and assistance rendered to defendant, it rejected a restitutionary theory as a basis for damages and entered into judgment nominal damages of only $1.

Plaintiffs appeal the district court's calculation of damages at $1. Defendant cross-appeals the district court's findings to the extent it found the teaming agreement an enforceable contract under Pennsylvania law. We address these issues in turn.

II. Was There a Valid and Enforceable Contract?

The first issue, raised in defendant's cross-appeal, is whether there existed a valid and enforceable contract between the parties. Defendant argues on appeal that any agreement intended between the parties cannot, as a matter of law, constitute an enforceable contract because of the failure to agree on essential terms of the contract. In particular, defendant emphasizes that the parties never

9

reached a final agreement on the price of plaintiffs' subcontract and the absence of such a term must prove fatal to contract formation. Defendant further asserts that the teaming agreement at issue in this case is aptly characterized, at best, as an "agreement to agree," which is incapable of enforcement under Pennsylvania law.

Plaintiffs dispute defendant's analysis and vigorously maintain that the agreement between the parties constituted a valid and enforceable contract. Here, plaintiffs assert that defendant's conduct through the negotiation of subcontracts demonstrates an acceptance of their price officer, and therefore the agreement cannot fail for lack of definiteness. Moreover, plaintiffs contend that regardless of the pricing terms of the subcontract, defendant breached its agreement to work exclusively with them in negotiating a subcontract and this constituted a breach of the teaming arrangement which itself is a binding agreement.

This issue of contract formation invokes a mixed standard of appellate review. The district court's factual findings, especially with respect to the parties' intentions, will not be reversed unless the record demonstrates that they are clearly erroneous. See Fed. R. Civ. P. 52(a). Similarly, the interpretation of contractual language to discern contractual intent is a factual question, which we will accordingly review under a clearly erroneous standard. See Painewebber Inc. v. Hartmann, 921 F.2d 507, 510 (3d Cir. 1990). Conclusions drawn with respect to the legal effect of any agreement, however, are questions of law and therefore subject to plenary review. See Linder v. Inhalation Therapy Servs., Inc., 834 F.2d 306, 310 (3d Cir. 1987).

A. Elements of Contract Formation and Teaming Agreements

It is by now hornbook law that "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986) (citing Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956); Linnet v. Hitchcock, 471 A.2d

10

537, 540 (Pa. Super. Ct. 1984)). Consideration is, of course, a required element of contract formation. Id. at 299. While typically analyzed in terms of offer and acceptance, see 1 Arthur L. Corbin, Corbin on Contracts S 12, at 27 (1963), the decisive inquiry in contract formation is the "manifestation of assent of the parties to the terms of the promise and to the consideration for it . . . ." 1 Samuel Williston, A Treatise on the Law of Contracts S 23, at 51 (Walter H. E. Jaeger ed., 3d ed. 1957); Restatement (Second) of Contracts S 22 (1981) ("Restatement"). Thus, applying Pennsylvania law, we look to: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration. See Channel Home Ctrs., 795 F.2d at 299; Johnston the Florist, Inc. v. Tedco Constr. Corp., 657 A.2d 511, 516 (Pa. Super. Ct. 1995).

In the attempt to ascertain the outward manifestation of intention expressed by the parties, it is often helpful to consider the general usage or custom prevailing in a given market. See 5 Samuel Williston, supra, S 648, at 1-2 nn.1-2. We therefore consider "teaming agreements," as that term is normally understood within the context of government contracting. Typically, a teaming agreement is an arrangement whereby a subcontractor will "team" with a company intending to bid on a government contract as a prime contractor in order to pool financial and technical resources. See Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1037 n.1 (9th Cir. 1983); Experimental Eng'g v. United Tech. Corp., 614 F.2d 1244, 1245 (9th Cir. 1980); Air Tech. v. General Elec. Co., 199 N.E.2d 538, 547 (Mass. 1964); see also Colsa Corp. v. Martin Marietta Servs., Inc., 133 F.3d 853, 854 (11th Cir. 1998). The subcontractor would ordinarily provide technical expertise and assist in the prime contractor's bid submission in return for the prime contractor's promise to award the subcontract. Parties to such a teaming agreement benefit from the arrangement not only as a means of sharing resources, but also as a hedge against the many uncertainties involved in government contracting.

In many cases, the finalized subcontract between the parties to a teaming agreement will specifically enumerate

11

the scope of obligations for each party contingent upon the prime contractor winning the RFP so that there is usually little need to enforce the teaming arrangement itself. Often, however, the parties may reach an understanding to team, but fail to execute a subcontract as anticipated in the teaming agreement. See McDonnell Douglas, 705 F.2d at 1037; Experimental Eng'g, 614 F.2d at 1245; Air Tech., 199 N.E.2d at 548. As with most other "preliminary agreements" precedent to an executed contract, see generally  E. Allan Farnsworth, Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations, 87 Colum. L. Rev. 217 (1987), the question arises whether the teaming agreement itself, absent an executed subcontract, may constitute the basis for contractual liability. Courts have generally allowed such a cause of action in contract based solely on the teaming agreement, see Brent E. Newton, Note, The Legal Effect of Government Contracting Teaming Agreements: A Proposal for Determining Liability and Assessing Damages in Event of Breach, 91 Colum. L. Rev. 1990, 2010–13 (1991) (collecting cases), but not without overcoming two major obstacles: (1) the intent of the parties to enter into a binding contractual relationship; and (2) the existence of sufficiently objective criteria to enforce. See, e.g., Allen & Co. v. Occidental Petroleum Corp., 382 F. Supp. 1052, 1057 (S.D.N.Y. 1974), aff'd, 519 F.2d 788 (2d Cir. 1975).

These two factors for consideration closely track the general elements of contract formation. For instance, it is well established that evidence of preliminary negotiations or a general agreement to enter a binding contract in the future fail as enforceable contracts because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce. See Goldman v. McShain, 247 A.2d 455, 458 (Pa. 1968); Reich v. Vegex, Inc., 51 F. Supp. 99, 103 (E.D. Pa. 1942) (applying Pennsylvania law); 1 Joseph M. Perillo, Corbin on Contracts S 2.8(a), at 131–34 (Rev. ed. 1993). Conversely, it is equally well established in contract law that an agreement with open terms may nevertheless constitute an enforceable contract. See Carlos R. Leffler, Inc. v. Hutter, 696 A.2d 157, 163 (Pa. Super. Ct. 1997); 1 Joseph M. Perillo, supra, S 2.8, at 138–39; cf. Uniform

12

Commercial Code S 2-311(1) ("An agreement for sale which is otherwise sufficiently definite . . . to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one the parties."). With teaming agreements, courts are particularly sensitive to what the parties intended in agreeing to "team" -- that is, searching for sufficiently definite terms for enforcement other than the simple promise to enter into a subcontract at a later date -- and whether that teaming agreement was intended to bind the parties during the various stages of government contract procurement. See, e.g., Occidental Petroleum, 382 F. Supp. at 1057; Air Tech., 199 N.E.2d at 547-58.

The fact that the parties never finalized an implementing subcontract is usually not fatal to enforcing the teaming agreement on its own -- if the parties intended the teaming agreement itself to constitute a binding agreement that enumerated definite terms of behavior governing the parties during, or even after, the bidding process. See, e.g., Air Technology Corp., 199 N.E.2d at 547-58; Experimental Eng'g, 614 F.2d at 1246-47; but see W.J. Schafer Assocs., Inc. v. Cordant, Inc., 493 S.E.2d 512 (Va. 1997) (teaming agreement standing alone did not create any binding obligations). Such terms might include the subcontractor's assistance in the prime contractor's proposal in return for the prime contractor's delivery of an agreeable subcontract. See Experimental Eng'g, 614 F.2d at 1246. Or, the parties might promise to work exclusively with each other in preparing the bid for the government contract. See McDonnell Douglas, 705 F.2d at 1038-38. Of course, if the parties to a teaming agreement do not wish to create binding obligations before executing an ultimate subcontract, they need only say so. See 1 Joseph M. Perillo, supra, S 2.9.

Pennsylvania law has not to date explicitly recognized the validity of teaming agreements as enforceable contracts, and the defendant argues that Pennsylvania law would not recognize such an arrangement without a finalized subcontract because of the absence of an essential term. We disagree. Pennsylvania courts have long since recognized that "the paramount goal of contractual

13

interpretation is to ascertain and give effect to the intent of the parties." Greene v. Oliver Realty, Inc. , 526 A.2d 1192, 1194 (Pa. Super. Ct. 1987) (citing Burns Mfg. Co. v. Boehm, 356 A.2d 763, 766 (Pa. 1976)). Indeed, the omission of an essential term in a contract, such as price, does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite. See, e.g., Kuss Mach. Tool & Die Co. v. El-Tronics, Inc., 143 A.2d 38, 40 (Pa. 1958); Greene, 526 A.2d at 1193; cf. Restatement, supra, S 204 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."). Analyzing Pennsylvania law, for example, we have previously concluded that a "letter of intent" between parties to a transaction created a "mutually binding obligation," even though the parties never reached a final agreement on the terms of the bargain. Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986). Given that the letter of intent possessed sufficient specificity as to the underlying transaction, the critical inquiry under Pennsylvania law was simply whether the parties had intended to be bound by the terms of such a preliminary agreement. Id. We conclude that Pennsylvania law would recognize a teaming agreement as an enforceable contract provided that the parties intended to be bound by the teaming arrangement and the agreement contains sufficient terms for enforcement.

B. The Teaming Agreement as Contract

With these principles in mind, we consider whether the teaming agreement itself, as expressed in the parties' correspondences, constitutes an enforceable contract notwithstanding the parties' ultimate failure to execute a subcontract for the Greek project. Because no party on appeal asserts as a defense a lack of consideration, we look to: (1) whether both parties manifested an intention to be bound by the teaming agreement; and (2) whether the terms of that agreement are sufficiently definite.

14

The district court concluded that the parties manifested their mutual assent to be bound by the terms of the teaming arrangement, as outlined in the various letters circulated between plaintiffs and defendant. Wefind nothing clearly erroneous with this factual finding. The record contains numerous correspondences by both parties clearly indicating their "inten[t] to team" and work exclusively with each other in preparation for the Greek RFP. App. at 1671. Defendant itself represented to the Greek government that plaintiffs constituted part of the "team" that would undertake the project under defendant's auspices as prime contractor. As a result, we conclude, as did the district court, that the plaintiffs have met their burden in establishing the intention to be bound by the terms of the teaming agreement during the negotiations for a subcontract to be executed by the parties.

Even if plaintiffs have established evidence of the parties' mutual assent to be bound by the teaming agreement, that agreement must contain sufficiently definite terms for enforcement or else, as explained above, there is no basis for the court to fashion a suitable remedy. After a thorough review of the relevant correspondences, the district court concluded that the plaintiffs established sufficiently definite terms of the teaming arrangement. In particular, the district court held that plaintiffs had promised to assist in defendant's bid for the Greek RFP, introduce defendant to their Greek agent, and work exclusively with defendant in return for good faith and exclusive negotiations with plaintiffs toward executing a subcontract. We agree that the letters of intent and draft subcontracts exchanged between the parties clearly outline the terms of this transaction as an expression of the parties' intent. This is not, as defendant argues on appeal, nothing more than a simple "agreement to agree" given the specificity of the duties carefully described in the draft subcontracts and letters of intent. Nor did the parties indicate that the terms of their teaming agreement were subject to final execution of the subcontract. See Schermer v. Wilmart, 127 A. 315, 315–16 (Pa. 1925). Thus, because the plaintiffs have successfully proved the elements of contract formation as applied to teaming agreements, we conclude that the teaming agreement between plaintiffs and defendant constitutes a

15

valid and enforceable contract with the terms found by the district court.

Accordingly, to the extent that defendant's cross-appeal challenges the district court's finding that the teaming arrangement was an enforceable contract, we will affirm.

III. Damages

We now turn to plaintiffs' primary appeal -- that the district court erred in assessing nominal damages of $1. Plaintiffs press several arguments in their cause. First, they contend that the district court erred in looking to calculate damages with "reasonable certainty." Plaintiffs maintain instead that defendant must shoulder the burden of any uncertainty caused by its breach of contract. In the alternative, plaintiffs assert that they had proved damages with reasonable certainty. Here, plaintiffs claim that they should receive approximately $2.3 million in lost profits, which they calculate as their 35% profit margin of their final price quote in addition to costs and variousfinancing fees. Plaintiffs suggest that if this court is unwilling to award such an amount in expectation damages, then the appropriate remedy would be a remand for furtherfindings with respect to reasonable profits or the parties' willingness to negotiate the terms of the subcontract.

In support of the district court's assessment of nominal damages, defendant emphasizes that the parties never agreed on the price of the contemplated subcontract. Because the district court could not evaluate lost profits without the agreed upon subcontract price, any expectation damages would be based solely on speculation. Defendant also objects to plaintiffs' request for a remand for factual findings with respect to an alternative measure of damages. It notes that plaintiffs have pursued their lost profits theory of damages before the district court to the exclusion of other possible remedies, and now they must be bound by that decision. We face these issues in turn.

A. Theories of Contract Enforcement by an Award of Damages

In general, contract law espouses three distinct, yet equally important, theories of damages to remedy a breach

16

of contract: "expectation" damages, "reliance" damages, and "restitution" damages. See Trosky v. Civil Serv. Comm'n, 652 A.2d 813, 817 (Pa. 1995); Restatement, supra, S 344. The preferred basis of contract damages seeks to protect an injured party's "expectation interest" -- that is, the interest in having the benefit of the bargain -- and accordingly awards damages designed to place the aggrieved in as good a position as would have occurred had the contract been performed. See Trosky, 652 A.2d at 817; Restatement, supra, SS 344(a), 347. Toward that end, expectation damages are measured by "the losses caused and gains prevented by defendant's breach, to the extent that are in excess of any savings made possible by nonperformance." American Air Filter Co. v. McNichol, 527 F.2d 1297, 1299 (3d Cir. 1975) (citations omitted).

While the traditional law of contract remedies implements the policy that goods and services should be consumed by the person who values them most highly, and hence the preference for expectation damages, other theories of damages provide alternative avenues for contract enforcement. This is especially so where an injured party is entitled to recover for breach of contract, but recovery based on traditional notions of expectation damages is clouded because of the uncertainty in measuring the loss in value to the aggrieved contracting party. See Restatement, supra, S 349 cmt. a; 5 Arthur L. Corbin, supra, S 1031, at 188. Thus, where a court cannot measure lost profits with certainty, contract law protects an injured party's reliance interest by seeking to achieve the position that it would have obtained had the contract never been made, usually through the recovery of expenditures actually made in performance or in anticipation of performance. See DePaolo v. DeRomo, 31 A.2d 158, 161 (Pa. 1943); In re Kellet Aircraft Corp., 191 F.2d 231, 236 (3d Cir. 1951); 5 Arthur L. Corbin, supra, S 1031, at 188.

Finally, damages under a theory of restitution provides an appropriate form of relief in many contract cases. Its objective is not the enforcement of contracts through the protection of an injured party's expectation or reliance interests, but is instead rooted in common notions of equity through the protection of the injured's restitution interest.

17

See Fidelity Fund, Inc. v. DiSanto, 500 A.2d 431, 438 (Pa. Super. Ct. 1985); 5 Arthur L. Corbin, supra, S 1101, at 548; Restatement, supra, Ch. 16, Topic 4, intro. note, at 199. Accordingly, restitution damages will require the party in breach to disgorge the benefit received by returning it to the party who conferred it. See Trosky, 652 A.2d at 817. Pennsylvania courts will look to traditional principles of equity, such as unjust enrichment or forfeiture, in considering the propriety of restitution damages. See DiSanto, 500 A.2d at 438-39.

1. The Standard of Proof

With these principles in mind, we now address plaintiffs' first contention on appeal -- that they need not demonstrate damage flowing from breach to a "reasonable certainty." Although mathematical certainty is not typically required, the general rule in Pennsylvania, as in most jurisdictions, is that if damages are difficult to establish, an injured party need only prove damages with reasonable certainty. See Scobell, Inc. v. Schade, 688 A.2d 715, 719 (Pa. Super. Ct. 1997); Sobers v. Shannon Optical Co., 473 A.2d 1035, 1039 (Pa. Super. Ct. 1984); see also Restatement, supra, S 352; 5 Arthur L. Corbin, supra, SS 1020, 1022. Doubts are construed against the breaching party. See Delahanty v. First Pennsylvania Bank, 464 A.2d 1243, 1257 (Pa. 1983); Restatement, supra, S 342 cmt. a.

"Reasonable certainty," as with most other standards of proof, is a difficult concept to quantify, but Pennsylvania courts have provided guidance as to what the term entails for purposes of assessing damages. At a minimum, reasonable certainty embraces a rough calculation that is not "too speculative, vague or contingent" upon some unknown factor. See Spang & Co. v. United States Steel Corp., 545 A.2d 861, 866 (Pa. 1988). Conversely, applying the reasonable certainty standard does not preclude an award of damages because of "some uncertainty as to the precise amount of damages incurred." Pugh v. Homes, 405 A.2d 897, 909 (Pa. 1979). Pennsylvania jurisprudence governing the issue is summarized in Aiken Indus., Inc. v. Estate of Wilson, 383 A.2d 808 (Pa. 1978), where the Pennsylvania Supreme Court ultimately concluded "that

18

compensation for breach of contract cannot be justly refused because proof of the exact amount of loss is not produced, for there is judicial recognition of the difficulty or even impossibility of the production of such proof. What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages." Id. at 812.

Plaintiffs' cited authority is not to the contrary. See Spang & Co. v. United States Steel Corp., 545 A.2d 861 (Pa. 1988); Delahanty v. First Pennsylvania Bank, 464 A.2d 1243 (Pa. 1983); Pugh v. Holmes, 405 A.2d 897 (Pa. 1979); Standard Pipeline Coating Co. v. Solomon & Teslovich, Inc., 496 A.2d 840 (Pa. Super. Ct. 1985). None of these cases establish a more relaxed standard of proof than that required by reasonable certainty. The Restatement itself, which promulgates a reasonable certainty standard, states that "[d]amages need not be calculable with mathematical accuracy and are often at best approximate." Restatement, supra, S 352 cmt. a. Thus, we conclude that the district court correctly applied Pennsylvania law in attempting to ascertain damages with reasonable certainty.

## 2. Damages Appropriate to the Breach of the Teaming Agreement

Having established the necessary standard of proof to recover damages as a consequence to breach of contract, we now address whether plaintiffs have met such a burden. The district court held that it could not assess expectation damages measured in lost profits because the parties never agreed to a price on plaintiffs' subcontract. While the district court considered the possibility of restitution damages, it concluded that it could not place a definite value on the benefit realized by defendant as a result of plaintiffs' performance. Plaintiffs do not claim reliance damages on appeal, nor did the district court address that possibility as an alternative measure of damages.

## a. Expectation Damages

Plaintiffs maintain on appeal that they have met their burden of proving expectation damages to a reasonable

certainty. Although courts have applied expectation damages to remedy the breach of a teaming agreement, see Air Tech., 199 N.E.2d at 548-49, we find the requisite proof of plaintiffs' expectation interest, measured in reasonably certain lost profits, lacking in this case. Even when discounted to reflect uncertainty, there would be absolutely no basis for the district court to place a value on plaintiffs' subcontract. As the record clearly demonstrates, the parties were far from agreeing on a contract price, financing fees, and other terms of the subcontract. Indeed, the district court found through ample support in the record that "significant obstacles" stood in the way of an agreement on the subcontract's price, and that the plaintiffs had not presented sufficient evidence that further negotiations would likely have proven fruitful. It is true, as plaintiffs note, that the Pennsylvania law of contracts allows for some uncertainty in calculating damages -- perhaps even a significant amount of uncertainty -- but a lost profits calculus based solely on unsubstantiated speculation and conjecture cannot form the basis of recovery. See Spang & Co., 545 A.2d at 866. Such a vague and speculative determination would have been necessary in this case if the district court assessed lost profits as damages, and accordingly the district court correctly declined to award expectation damages. See E. Allan Farnsworth, supra, 87 Colum. L. Rev. at 264 (lost profits not appropriate with a breach of a preliminary agreement because there is "no way of knowing what the terms of the ultimate agreement would have been, or even whether the parties would have arrived at an ultimate agreement"); Brent E. Newton, supra, 91 Colum. L. Rev. at 2028 (same).

b. Restitution

Notwithstanding any uncertainty in assessing lost profits as a measure of expectation damages, contract law does not preclude an otherwise appropriate remedy under a restitution theory of damages. This is especially the case where, as here, unknown variables cloud a reasonably certain calculation of lost profits stemming from the breach of the teaming agreement. See Air Tech., 199 N.E.2d at 549. Thus, we agree that it would be appropriate for the district

20

court to measure "the fair value of [the subcontractor's] contribution to [the prime contractor's] agreement," in order to protect the subcontractor's restitution interest. Id.

As the district court properly concluded in this case, plaintiffs contributed valuable services to defendant's Greek RFP bid and significantly enhanced its chances of winning the project. However, the court ultimately held that "it is not clear how to quantify the value of those services," and therefore denied restitution as a measure of damages. While we share the district court's appreciation of the difficulties in measuring the benefit conferred on defendant, we believe the court's denial of restitution as a possible remedy premature without an evidentiary hearing. The district court, with characteristic courtesy, did invite the parties to further brief the issue of restitution, but it did not offer them an opportunity to present additional evidence that might shed light on the quantification of restitution damages. Such evidence might include the testimony of knowledgeable experts in the field who would testify as to the reasonable value of plaintiffs' technical and consulting services in this market of government contracting. Furthermore, as the plaintiffs claimed before the district court, defendant saved approximately $2 million by subcontracting with Craig and Airflow. See App. at 835. If this is indeed the case, the district court may then consider how much of that savings reflected preliminary services rendered by the plaintiffs that ultimately benefitted the Craig proposal. Thus, given the possibility of the plaintiffs' proving reasonable restitution damages, we will vacate the district court's entry of judgment against defendant for nominal damages in the amount of $1. In arriving at this conclusion to remand, we believe that equitable considerations must predominate over a parochial approach to the number of issues properly before us.

IV. Conclusion

For the foregoing reasons, the judgment of the district court will be affirmed except as to the award of nominal damages. The entry of judgment against defendant in the amount of $1 will be vacated and the matter remanded to

21

the district court in accordance with the directions in this
opinion.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit