**Cal FISHKIN; Igor Chernomzav; Francis Wisniewski,**

v.

**SUSQUEHANNA PARTNERS, G.P.; Susquehanna International Group, LLP, Defendants/Counter Claimants**

v.

**TABFG, LLC; NT Prop Trading LLC; Richard Pfeil, Counter Defendants.**

---

Susquehanna International Group, LLP, Appellant.

No. 08–3100.

United States Court of Appeals, Third Circuit.

Argued on June 11, 2009.

Filed: July 27, 2009.

M. Norman Goldberger, Esq. (Argued), Matthew A. White, Esq., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Appellant.

David S. Ruskin, Esq. (Argued), Megan M. Mathias, Esq., Horwood, Marcus & Berk, Chicago, IL, Eric B. Meyer, Esq., Dilworth Paxson, LLP, Philadelphia, PA, for Appellee NT Prop Trading LLC and Richard Pfeil.

Kenneth A. Sweder, Esq. (Argued), Sweder & Ross, Boston, MA, Paul J. Greco, Esq., Conrad O'Brien Gellman & Rohn, P.C., Philadelphia, PA, for Appellees Cal Fishkin, Igor Chernomzav, and TABFG, LLC.

Before: McKEE, HARDIMAN, and VAN ANTWERPEN, Circuit Judges.

## OPINION

VAN ANTWERPEN, Circuit Judge.

This appeal stems from a dispute between Appellant Susquehanna International Group, LLP ("SIG"), a securities trading firm, and two of its former employees, Cal Fishkin and Igor Chernomzav, who left SIG and formed a competing securities trading joint venture, TABFG, LLC ("TABFG"), in partnership with NT Prop Trading, LLC ("NT Prop"). SIG now appeals from the District Court's Order of February 12, 2007, denying its motion for summary judgment regarding disgorgement of profits, and from the District Court's Order of June 17, 2008, denying its claim for misappropriation of trade se-

crets. For the reasons that follow, we will affirm.

### I.

Because we write solely for the parties, we will address only those facts necessary to our opinion.

In the spring of 1999, Cal Fishkin and Igor Chernomzav began working for SIG as securities traders, and each executed an employment contract containing restrictive covenants. One such covenant, the "Non-Competition" clause, provided in part that,

[f]or a period of nine (9) months following the later of the termination of [Employee's] employment or the third anniversary following Employee's entry into the training course, Employee shall not trade in any products in which he or she was trading for [SIG] at any time during the three (3) month period prior to the termination of Employee's employment.

The noncompetition clause also barred Fishkin and Chernomzav from disclosing confidential information about SIG's business and restricted them from associating with anyone employed at SIG during the nine months prior to their termination for a period of five years. The employment agreement provided SIG with alternative remedies in the event of a breach: (a) liquidated damages of $700,000 or $800,000, depending on the when the breach occurred; or (b) injunctive relief and other remedies to which it was entitled at law.

In August 1999, SIG assigned Francis Wisniewski to trade Dow Futures, which are futures contracts in the Dow Jones Industrial Average ("DJIA"),[1] in the trading pit at the Chicago Board of Trade.

---

1. A "future" is a derivative, which is a security that derives its value from an underlying security or asset. Specifically, a future is a contract to buy or sell a particular commodity at a specific price at a set time in the future.

The futures at issue in this litigation were contracts to buy or sell stocks in the DJIA or Standard & Poor's ("S&P") 500 Index—Dow Futures and S&P Futures, respectively—at a set price on a set date.

Following about a month of unsuccessful trading, Wisniewski developed a formula for calculating the expected values of Dow Futures based on his observation that successful traders of Dow Futures monitored trading data for the S&P 500 Index. Because all of the individual stocks in the DJIA are also included in the S&P 500 Index, Dow Futures and S&P Futures tend to move in the same direction, with S&P Futures typically adjusting to market movements slightly before such adjustments are reflected in the price of Dow Futures. Accordingly, SIG's Dow Fair Value formula reflected the relationship between S&P Futures and Dow Futures. After developing this formula, Wisniewski created a spreadsheet to make the formula's calculations more quickly. After two months of trading Dow Futures, SIG reassigned Wisniewski. He saved the spreadsheet containing the Dow Fair Value formula.

In August 2001, SIG reassigned Wisniewski to the Dow Futures pit and, shortly thereafter, assigned Fishkin to trade Dow Futures (and engage in related hedging transactions) with Wisniewski. They used the Dow Fair Value formula that Wisniewski previously developed and traded the product until March 2003; for the year 2002, Wisniewski and Fishkin earned SIG net trading profits of approximately $30 million.

Fishkin grew dissatisfied with his compensation and, in June 2002, sought to negotiate a new employment contract with SIG. SIG did not immediately respond to his request. Later that year, Fishkin was approached by a non-SIG trader representing a group that later became NT Prop about whether he would be interested in forming a new company to trade Dow Futures. Fishkin indicated that he would be interested in participating in the new trading group as of March 2003, when his contract with SIG expired. Between December 2002 and April 2003, Fishkin met with NT Prop representatives several times to discuss a trading venture; at one such meeting, NT Prop representatives asked Fishkin about SIG's profitability in trading Dow Futures. Fishkin told them that confidentiality provisions precluded him from revealing such information, but, when asked if he made more than $5 million at SIG, Fishkin replied by saying "you'll be pleased." In February 2003, Fishkin stopped trading for SIG and officially left the company in March 2003 (along with Chernomzav)[2] to start a competing business, TABFG, LLC. On March 31, 2003, articles of incorporation were filed for TABFG. In late April 2003, TABFG and NT Prop entered into a joint venture to trade securities and financial products on the Chicago Board of Trade (as well as other exchanges). TABFG began trading on April 25, 2003; it traded for four and one-half months until September 16, 2003, when it was enjoined from doing so by the District Court.

On March 30, 2003, Fishkin and Chernomzav, along with Francis Wisniewski, filed suit in the Court of Common Pleas of Montgomery County, Pennsylvania, seeking declaratory and injunctive relief to the effect that the noncompetition agreements in their employment contracts with SIG[3] were unenforceable. SIG filed a counterclaim seeking an injunction preventing Fishkin and Chernomzav from trading as well as damages for breach of contract,

---

**2.** Igor Chernomzav worked for SIG as an options trader. He did not trade Dow Futures with Fishkin at SIG.

**3.** The complaint named Susquehanna International Group, LLP, and Susquehanna Partners, G.P. These entities are one and the same.

misappropriation of trade secrets, conversion, tortious interference with contract, and civil conspiracy. SIG also impleaded TABFG; NT Prop; and Richard Pfeil, a principal of NT Prop, as third-party defendants. NT Prop and Pfeil removed the case to the U.S. District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1332.[4]

SIG moved for a preliminary injunction to enforce Fishkin's and Chernomzav's noncompetition agreements, and Judge James McGirr Kelly[5] granted that motion on September 16, 2003.[6] On February 3, 2006, SIG moved for summary judgment to make the injunctive relief permanent, and NT Prop filed a motion for summary judgment on April 21, 2006. On May 31, 2006, the District Court denied NT Prop's motion for summary judgment and granted SIG's motion, thereby making permanent the preliminary injunctive relief enforcing the employment contract's restrictive covenants against Fishkin and Chernomzav.

On February 12, 2007, the District Court considered cross-motions for summary judgment concerning the proper measure of damages resulting from Fishkin's and Chernomzav's breach of their noncompetition covenants. SIG sought to measure the amount of damages as the profits earned by Fishkin, Chernomzav, TABFG, and NT Prop; the District Court rejected this theory of damages and denied SIG's motion for summary judgment in its entirety. Conversely, Fishkin, Chernomzav, and TABFG contended that SIG could not prove the appropriate measure of damages—its own lost profits—and sought the dismissal of SIG's claims of breach of contract, tortious interference, and conspiracy. The District Court granted their motion in part, finding that the proper measure of damages for SIG's claims was its lost profits and that SIG could not establish that measure. Nevertheless, the District Court found that, because "there remain disputed issues of fact as to whether SIG was harmed by Mr. Fishkin and Mr. Chernomzav's trading in breach of their non-competition agreements," SIG was entitled to seek an award of nominal damages. Accordingly, it denied the motion of Fishkin, Chernomzav, and TABFG "to the extent it seeks to dismiss the claims at issue in these motions."

The District Court conducted a bench trial on the remaining claims from April 23, 2007, through April 26, 2007. On June 17, 2008, the District Court denied SIG's claim for misappropriation of trade secrets as well as related claims that are not at issue in the instant appeal. *Fishkin v. Susquehanna Partners, G.P.,* 563 F.Supp.2d 547 (E.D.Pa.2008). SIG now appeals the District Court's February 12, 2007, denial of its motion for summary judgment and the June 17, 2008, denial of its claim for trade secret misappropriation.

## II.

The District Court properly exercised jurisdiction pursuant to 28 U.S.C. § 1332.

---

**4.** On July 7, 2003, NT Prop and Pfeil filed a motion to dismiss, which was ultimately granted as to Pfeil and denied as to NT Prop. *Fishkin v. Susquehanna Partners, G.P.,* No. Civ. A. 03–3766, 2005 WL 1030199 (E.D.Pa. May 2, 2005).

**5.** On March 16, 2005, following the death of Judge Kelly, the case was transferred to Judge McLaughlin.

**6.** Fiskin, Chernomzav, and Wisniewski initially appealed this decision, but, pursuant to a motion by all parties, this Court dismissed the appeal on July 8, 2004 pursuant to Federal Rule of Appellate Procedure 42(b).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.[7] "[O]ur review of a grant of summary judgment is plenary, and in making that review we use the same standard as a district court: whether there are genuine issues of material fact precluding entry of summary judgment." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir.2009). As to SIG's appeal of the District Court's denial of its misappropriation of trade secrets claim following a bench trial, this Court reviews the District Court's factual findings for clear error and exercises plenary review over its conclusions of law and its interpretation of legal precepts. *Am. Soc'y for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557, 566 (3d Cir.2007).

### III.

### A. Damages for Contractual Breach[8]

SIG appeals the District Court's ruling that, because SIG could not establish its lost profits resulting from Fishkin's and Chernomzav's breach of their employment contracts, it was entitled only to nominal damages on its breach of contract claim. SIG argues that the District Court erred in denying its motion for summary judgment and in barring it from recovering restitution damages measured by the net trading profits made by TABFG during the four and one half months of 2003 during which it actively traded at the Chicago Board of Trade.

Pennsylvania law recognizes three possible remedies for a breach of contract: ex-pectation damages, reliance damages, and restitution damages. *Ferrer v. Trustees of Univ. of Pa.*, 573 Pa. 310, 825 A.2d 591, 609 (2002); *see also ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir.1998); *Trosky v. Civil Serv. Commc'n*, 539 Pa. 356, 652 A.2d 813, 817 (1995); Restatement (Second) of Contracts § 344 (1981). Although the preferred remedy for a contractual breach is the award of expectation damages, "measured by 'the losses caused and gains prevented by defendant's breach,'" *ATACS Corp.*, 155 F.3d at 669 (quoting *Am. Air Filter Co. v. McNichol*, 527 F.2d 1297, 1299 (3d Cir.1975)), a party may also sue for reliance or restitution damages in limited instances. "This is especially so where an injured party is entitled to recover for breach of contract, but recovery based on traditional notions of expectation damages is clouded because of the uncertainty in measuring the loss in value to the aggrieved contracting party." *Id.*

■ Before the District Court, SIG conceded that it could not calculate its lost profits resulting from the breach, thereby rendering inappropriate the preferred remedy of expectation damages. Nevertheless, SIG argued that it was entitled to restitution damages, which require a breaching party to "disgorge the benefit he has received by returning it to the party that conferred it." *Trosky*, 652 A.2d at 817 (quoting Restatement (Second) of Contracts § 344). In particular, SIG asserts that it conferred benefits on Fishkin

**7.** In the District Court's Memorandum and Order of February 12, 2007, it denied SIG's motion for summary judgment in its entirety. In addition, the court also ruled that SIG could only recover nominal damages for its breach of contract claim. Similarly, on June 17, 2008, the District Court issued an order denying SIG's counterclaims for misappropriation of trade secrets, conversion, and conspiracy. At argument, the parties agreed that the District Court has fully and finally disposed of the outstanding issues in this case. We agree, and accordingly we can exercise jurisdiction over these matters pursuant to § 1291.

**8.** The parties agree that the substantive contract law of Pennsylvania governs the issues raised in this dispute.

116

and Chernomzav, in the form of training and opportunities to learn the market and develop goodwill with other traders, and that the proper measure of restitution for those benefits would require the breaching parties to "disgorge" their net trading profits.[9]

The District Court concluded that this Court's decision in *American Air Filter*, 527 F.2d at 1299–1301, barred SIG's claim for disgorgement of TABFG and NT Prop's profits. In that case, American Air Filter sued its former employee, McNichol, and his new employer for breach of a noncompetition agreement, seeking injunctive and monetary relief. *Id.* at 1298–1300. The district court denied injunctive relief and entered judgment on a jury verdict in favor of the defendants. On appeal, American Air Filter sought to establish damages via (1) an accounting of profits made by McNichol's new employer, (2) McNichol's commissions earned with his new employer, and (3) its own decrease in profit in the territory served by the former employee after it left the company. This Court rejected American Air Filter's attempt to measure its damages by the profits of the breaching party's new employer, observing that "[t]he basic failing of the plaintiff's theory is that the defendant's profits are not necessarily equivalent to the plaintiff's losses.... To compel defendant to disgorge these profits could give plaintiff a windfall and penalize the defendant, neither of which serves the purpose of contract damages." *Id.* at 1300 &

n. 8 ("[A] defendant's profits are not the measure of a contract plaintiff's losses ...."); *see also U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 696–97 (2d Cir.1991) ("While on occasion the defendant's profits are used as the measure of damages, this generally occurs when those profits tend to define the plaintiff's loss, for an award of the defendant's profits where they greatly exceed the plaintiff's loss and there has been no tortious conduct on the part of the defendant would tend to be punitive, and punitive awards are not part of the law of contract damages." (citations omitted)).

SIG cites this Court's decision in *ATACS* in support of its argument that the profits of the breaching party can serve as the restitution interest for a breach of contract.[10] In *ATACS*, this Court considered the district court's award of nominal damages arising from a primary contractor's breach of a teaming agreement with a subcontractor where the subcontractor's lost profits could not be calculated with reasonable certainty. *ATACS*, 155 F.3d at 668. In exploring the applicability of restitution damages, this Court observed that restitution damages are "rooted in common notions of equity" and that they would "require the party in breach to disgorge the benefit received by returning it to the party who conferred it." *Id.* at 669. The *ATACS* Court vacated the district court's award of nominal damages and remanded for an evidentiary hearing to determine " 'the fair value of [the subcontractor's]

9. Before the District Court, SIG raised an alternative theory of restitution damages in which it asserted that, if the District Court rejected its claim for disgorgement of profits, it should be permitted to recover the cost of its training program. The District Court denied SIG's request, holding that "[e]ven this more limited restitution damage theory is inappropriate under Pennsylvania law." *Fishkin v. Susquehanna Partners, G.P.*, No. 03–3766, 2007 WL 560703, at *6 (E.D.Pa.

Feb.12, 2007). SIG does not appeal this determination.

10. SIG also relies on a Colorado decision, *EarthInfo, Inc. v. Hydrosphere Resource Consultants, Inc.*, 900 P.2d 113 (Colo.1995). Because *EarthInfo* did not involve the application of Pennsylvania law, we focus our analysis on the implications of *ATACS*.

contribution to [the prime contractor's] agreement' in order to protect the subcontractor's restitution interest." *Id.* at 671 (alternation in original; quoting reference omitted). Despite SIG's reliance on *ATACS* in support of its argument that the breaching party's profits can serve as restitution damages, the *ATACS* Court did not consider a request for disgorgement of the breaching party's profits. The *ATACS* subcontractor did not seek the primary contractor's profits on the contract; after unsuccessfully pursuing expectation damages, it sought restitution of the value of the services it rendered. *Id.* at 664–65, 668.

Thus, the *ATACS* Court's recognition of the possible remedy of restitution damages as measured by " 'the fair value of [the subcontractor's contribution]' " corresponds to Restatement (Second) of Contracts § 344's characterization of a party's restitutionary interest as the "interest in having restored ... any benefit that [it] has conferred on the other party." *See Trosky,* 652 A.2d at 817 (discussing § 344). Although SIG asserts that the benefits it conferred on Fishkin and Chernomzav "reasonably equate[ ] to the $3.5 million in profit they generated for themselves and their co-venturers," it has failed to demonstrate that the value of the benefit it conferred in the form of training and opportunities corresponds to the breaching parties' net trading profits. As the District Court noted, "the 'basic failing' of SIG's theory is that the counterclaim defendant's profits are not necessarily equivalent to SIG's losses, whether those losses are viewed as SIG's lost profits or SIG's restitution interest in the benefit of its training." Because SIG did not prove that the value of the benefit conferred equated to net trading profits earned by the breaching parties, the District Court's re-

jection of SIG's claim for restitution damages was proper.

We acknowledge that, in the securities trading industry, harm occasioned by the breach of a noncompetition covenant can be uniquely difficult to calculate. Nevertheless, securities trading firms are not without a means to protect themselves against this difficulty; they can include liquidated damages clauses in their employment agreements that provide for the disgorgement of profits by the breaching party. *See, e.g., Omicron Sys., Inc. v. Weiner,* 860 A.2d 554, 564–65 (Pa.Super.Ct.2004) (enforcing liquidated damages provision providing that, in the event of any breach of a restrictive covenant, "the Company shall be entitled to obtain ... preliminary and permanent injunctive relief as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such violation"); *Worldwide Auditing Servs., Inc. v. Richter,* 402 Pa.Super. 584, 587 A.2d 772, 777–78 (1991) (holding that a liquidated damages provision that provided for disgorgement of profit attributable to breaching party's violation of contractual covenant was enforceable). The parties' contract did include a liquidated damages provision— drafted by SIG—that did not provide for disgorgement. Instead, the provision gave SIG the choice to (a) accept liquidated damages of $700,000 or $800,000, or (b) pursue an injunction and other available, legal remedies. SIG chose the latter.

Accordingly, we will affirm the District Court's denial of SIG's claim for restitution damages.

### B. Trade Secret Misappropriation

SIG also appeals the District Court's Memorandum and Order dated June 17, 2008, denying trade secret protection for the knowledge that SIG's Dow Futures trading methodology was profitable.[11] In

---

11. The District Court also concluded that

SIG's Dow Fair Value concept, formula, and

particular, SIG asserts that, during Fishkin's discussions with NT Prop representatives between December 2002 and April 2003, Fishkin was asked about the profitability of SIG's Dow Futures trading. Although Fishkin told NT Prop that confidentiality provisions precluded him from revealing profitability information, when asked whether he made more than $5 million trading for SIG, Fishkin responded by saying "[y]ou'll be pleased." SIG contends that Fishkin's disclosure contained an implied assertion that its Dow Futures trading method was profitable to some degree greater than $5 million and that the disclosure of the extent of SIG's profitability motivated NT Prop's representatives to form a joint venture with TABFG to trade Dow Futures with Fishkin and Chernomzav.

■ To prevail on a claim for trade secret protection in Pennsylvania,[12] the party seeking protection must demonstrate:

(1) that the information constitutes a trade secret; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.

*Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 829 (3d Cir.2006) (quoting *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir.1985)).

As the District Court noted, "[t]he threshold inquiry in a trade secret misappropriation claim under Pennsylvania law is whether the information is a trade secret." *Fishkin*, 563 F.Supp.2d at 581 (quoting *Van Products Co. v. Gen. Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 780 (1965)); *see also Tyson Metal Prods., Inc. v. McCann*, 376 Pa.Super. 461, 546 A.2d 119, 121 (1988). Pennsylvania courts have adopted the definition of a trade secret as set forth in Restatement of Torts § 757 cmt. b.[13] *See Doebler*, 442 F.3d at 829. This provision states that "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain

spreadsheet did not warrant trade secret protection because, although SIG took steps to keep its method secret and the method was valuable for SIG, the Dow Fair Value trading approach was known and used by other traders, SIG did not invest a tremendous amount of time or money to develop the method, and other traders could duplicate SIG's approach fairly easily. *Fishkin*, 563 F.Supp.2d at 583–84; *see also Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 829 (3d Cir.2006) (setting forth six-factor test for whether a trade secret exists). On appeal, SIG abandons its claim that the trading strategy itself merited trade secret protection.

**12.** The parties agree that Pennsylvania law governs SIG's trade secret misappropriation claim. Although Pennsylvania adopted the

Uniform Trade Secrets Act, 12 Pa. Cons.Stat. Ann. § 5301 *et seq.*, effective April 19, 2004, the Act does not apply to misappropriation occurring before its effective date. *Id.* § 5301 hist. & stat. note. Because the conduct at issue occurred before April 19, 2004, the Uniform Trade Secrets Act does not apply; instead, Pennsylvania's common law governing trade secrets applies. *Doebler*, 442 F.3d at 829 n. 20.

**13.** This was the definition of a trade secret used before the passage of the Uniform Trade Secrets Act. As detailed in note 12, *supra*, the relevant law for the purposes of this litigation is the law of trade secrets in Pennsylvania before the adoption of the Uniform Trade Secrets Act.

an advantage over competitors who do not know or use it." Restatement of Torts § 757 cmt. b. Information is not entitled to trade secret protection if it is generally known, or easily derived from available information, in the relevant business community. *Id.*

This Court has enumerated several factors to consider when determining whether information constitutes a trade secret deserving of protection:

(1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Doebler,* 442 F.3d at 829 (citing *SI Handling Sys., Inc.,* 753 F.2d at 1256); *accord* Restatement of Torts § 757 cmt. b.

In some circumstances, courts have applied Pennsylvania law to permit trade secret protection of information concerning a company's profitability, such as that company's specific profit margins. *SI Handling Sys.,* 753 F.2d at 1260 (concluding that "range of data relating to materials, labor, overhead, and profit margin, among other things" qualified for trade secret protection to extent it was not "readily obtainable by anyone in the industry"); *see also Den–Tal–Ez, Inc. v. Siemens Capital Corp.,* 389 Pa.Super. 219, 566 A.2d 1214, 1230 (1989) ("[I]nformation like ... inventory data and projections, details unit costs and product-by-product profit margin data is protectible as trade secrets.").

Despite the recognition that some profitability information may warrant trade secret protection, the District Court properly rejected SIG's misappropriation claim. The information for which SIG sought protection was not its specific profit margins or its precise profitability; it was the fact of its profitability coupled with a limited suggestion of the extent of its profitability. In particular, Fishkin's statement that NT Prop representatives would be "pleased" with the profitability of SIG's Dow Futures trading method implied that SIG was profitable to some extent greater than $5 million.

As the District Court noted, the fact that Fishkin and Wisniewski were making money for SIG was already known to other traders. Under the circumstances, Fishkin's statement, while implying a certain threshold of profitability, did not sufficiently convey the extent of SIG's profitability to merit trade secret protection. Indeed, at the same time that Fishkin stated NT Prop would be pleased, he also declined to provide actual profitability information. A suggestion about the extent of a company's profitability, without more, is of limited value to the competitor and could easily be interpreted as mere puffery. Thus, Fishkin's statement is akin to the knowledge of the "hotness" of a product, which the Pennsylvania Supreme Court has rejected as a basis for trade secret protection. *See Van Prods. Co.,* 213 A.2d at 773, 775–76 (denying trade secret protection to a drying machine manufacturer when its former employee joined a competitor and disclosed fact that deliquescent desiccant air dryers were "hot product[s]"). Just as the Pennsylvania Supreme Court held that the "hotness" of a particular product was ascertainable to industry competitors in *Van Products,* other industry participants could observe and

determine that SIG's trading in Dow Futures was profitable.

SIG points to more recent Pennsylvania case law in support of its claim for trade secret protection. Specifically, in *Air Products & Chemicals, Inc. v. Johnson*, 296 Pa.Super. 405, 442 A.2d 1114 (1982), the Superior Court of Pennsylvania affirmed a trial court's issuance of an injunction preventing a former vice-president of Air Products from participating in certain employment practices at Liquid Air, a competitor of Air Products. The *Air Products* court found that "the identification of opportunities in the field as well as the extremely complex technological problems and commercial plans which must be made to exploit those opportunities" constituted information entitled to trade secret protection. *Id.* at 1119. While at Air Products, the employee had gained knowledge specific to the "on-site" business of industrial gas sales, including methods of delivery of on-site gas and an analysis of market opportunities; Liquid Air was not aware of this information. SIG contends that, like the information found protectible in *Air Products*, the knowledge that its trading business was profitable to an extent greater than $5 million was "extremely valuable to a competitor since it would cut the development risk involved in a similar project." *See Air Products*, 442 A.2d at 1117. Nevertheless, the justifications for protecting the information at issue in *Air Products*— specifically the "considerable expense" of Air Products' research and the "extremely complex technological problems" involved— are not implicated by SIG's claim for protection in the knowledge of the profitability of its Dow Futures trading method. Accordingly, the District Court's denial of SIG's claim of a trade secret in the fact and extent of the profitability of its Dow Fair Value trading method was proper.

### C. Sanctions

■ On May 7, 2009, Appellees Fishkin, Chernomzav, and TABFG filed a Motion for Sanctions against SIG for filing a frivolous appeal in violation of Federal Rule of Appellate Procedure 38. Rule 38 provides that "[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee."

This Court applies an objective standard to determine if an appeal is frivolous, or wholly without merit. *Quiroga v. Hasbro, Inc.*, 943 F.2d 346, 347 (3d Cir.1991). "'The test is whether, following a thorough analysis of the record and careful research of the law, a reasonable attorney would conclude that the appeal is frivolous.'" *Id.* (quoting *Hilmon Co. v. Hyatt Int'l*, 899 F.2d 250, 253 (3d Cir.1990)); *see also Nagle v. Alspach*, 8 F.3d 141, 145 (3d Cir.1993) ("[W]e move with caution and will not label an appeal frivolous unless it lacks colorable support or is wholly without merit."). Appellees' motion should be denied, as it does not constitute part of "that narrow category of appeals" that Rule 38 is meant to discourage. *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 62 (3d Cir.1986).

### IV. Conclusion

Based on the foregoing, we will affirm the District Court's denial of SIG's disgorgement theory of damages and its denial of SIG's claim of trade secret misappropriation. Further, we will deny Appellees' motion for sanctions pursuant to Rule 38.