

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-2003

# Edwards v. Wyatt

Precedential or Non-Precedential: Precedential

Docket No. 02-3448

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Edwards v. Wyatt" (2003). *2003 Decisions.* Paper 320.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/320

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 18, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 02-3448

———————

JOHN JOSEPH EDWARDS,
                              *Appellant*

v.

A. WESLEY WYATT

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 01-cv-01333)
District Judge: Honorable James McGirr Kelly

———————

Argued: Thursday, April 24, 2003

Before: SCIRICA, *Chief Judge*, AMBRO and
GARTH, *Circuit Judges*

(Opinion Filed: July 18, 2003)

Stephen L. Braga (argued)
Rebecca H. Ewing
Baker Botts
1299 Pennsylvania Avenue, N.W.
The Warner
Washington, DC 20004-2400

*Counsel for Appellant*

Jeffrey A. Zucker (argued)
Fisher & Zucker
121 South Avenue of the Arts
Suite 1200
Philadelphia, PA 19107

*Counsel for Appellee*

---

## OPINION OF THE COURT

---

GARTH, *Circuit Judge*:

This case involves a dispute between two businessmen, John J. Edwards, the plaintiff-appellant, and A. Wesley Wyatt, the defendant-appellee, concerning control over Pilot Air Freight Corporation ("Pilot"), an air freight forwarding company.

Edwards and Wyatt were introduced to one another by a Philadelphia attorney, Richard Phillips, who represented both businessmen separately. Phillips became involved in the business as well, and a conflict over the company's management and control ensued. The dispute has been marked by shifting alliances and agreements among these three individuals.

This appeal arises from Edwards' action against Wyatt for breach of an oral contract. Edwards appeals from the district court's judgment in favor of Wyatt after a non-jury trial. The district court held that, though there was a contract, Wyatt had established a defense of anticipatory repudiation.

Edwards has argued, however, that Wyatt waived any defense of repudiation and denies, in any event, that an anticipatory repudiation occurred. Of even greater significance, Edwards contends that the district court did not consider the evidence of events that took place after a July 31, 1998 letter, which the district court held had constituted Edwards' repudiation of the agreement with Wyatt. These events, Edwards claims, either nullified any "repudiation" or reconstituted an agreement between Edwards and Wyatt.

Finally, Edwards complains that the district court failed to address or resolve Edwards' alternative claim that he was entitled to relief against Wyatt based on the doctrine of promissory estoppel. That claim was pleaded in Count Two of Edwards' Complaint.

Our review leads us to conclude that, indeed, the district court did not consider material trial evidence — or if it did, it failed to refer to any such evidence in its opinion. Nor did the district court make findings of fact relating to that evidence, which pertained to events that took place after July 31, 1998. Moreover, the district court failed in its opinion to express its reasoning or findings having to do with the alternate count which Edwards pleaded — the promissory estoppel count. It is for these reasons that we will reverse the district court's judgment and remand for a new trial.

## I.

These parties have had a long and convoluted relationship. At various times, Edwards aligned himself with Wyatt and against Phillips. At other times, Wyatt aligned himself with Phillips and against Edwards. At still other times, Edwards and Wyatt were aligned with one another against Phillips. In each instance, the efforts were designed to gain control of Pilot. These shifting alliances did little credit to any of these three individuals. Eventually, however, Edwards' and Wyatt's meetings came down to an April 1998 oral agreement, known as the "Handshake Agreement."

Therefore, we will first describe, as briefly as possible, the relevant events that occurred prior to the formation of the Handshake Agreement. We will then discuss in fuller detail the Handshake Agreement, followed by Edwards' purported repudiation of that agreement on July 31, 1998, and then the events that took place following the "repudiation."[1]

---

1. There are several other meetings, dealings, and events that are described in the trial testimony, occurring both before and after the Handshake Agreement and the July 31, 1998 "repudiation." The district court, in its opinion, discussed some — but not all — of this evidence.

### A. Activities Prior to the Handshake Agreement

Edwards was the president of Pilot, and owned one-third of the one hundred total issued shares of stock in Pilot. The remaining shares were owned by Edwards' cousins. *Edwards v. Wyatt*, No. 01-cv-1333, 2002 WL 1832814, at *1 (E.D. Pa. Aug. 5, 2002) (Findings of Fact ¶¶ 4, 5). In 1993, Phillips, who was counsel to both Edwards and Wyatt, introduced the two, because he believed that Wyatt might be able to help Edwards and Pilot by investing in Pilot. *Id.* (Finding of Fact ¶ 6). Both Wyatt and Phillips invested in Pilot, and Phillips became Pilot's chairman.

Shortly thereafter, "Edwards decided to adopt an exit strategy from Pilot because of Phillips' approach to running it." *Id.* (Finding of Fact ¶ 10). At first, Wyatt and Edwards agreed to push Mr. Phillips out of Pilot. Wyatt, however, changed his mind, and in April 1995 realigned "with Phillips to vote Edwards out of Pilot and put Phillips back in charge of the company." *Id.* at *2 (Finding of Fact ¶ 15).

Following his removal from Pilot, Edwards filed for bankruptcy. The assets of Edwards' bankruptcy estate included his one-third interest in Pilot as well as claims Edwards had against Wyatt, Pilot and Phillips. *Id.* (Finding of Fact ¶ 18).

Edwards, who had been acting *pro se*, retained Stephen L. Braga as counsel to represent him in the bankruptcy proceeding.[2] JA 685 (Stipulation of Facts ¶ H).

---

Inasmuch as we are reversing the district court's judgment and remanding for a new trial, the parties may produce evidence of these events at the new trial for the district court's edification. Hence, we do not mean, by our abbreviated recitation of the evidence adduced at trial, to indicate that these discussions and dealings may not be relevant before the district court on remand.

2. This case involves the unusual circumstance in which Braga, a key witness for Edwards, simultaneously served as his lead trial counsel, and indeed, represents him on appeal. Edwards' brief explains that Edwards "agreed to stipulate to a bench, rather than a jury, trial in exchange for Wyatt's agreement to waive whatever objection he might have under the advocate-witness rule to Braga's participation as trial counsel in the case." Edwards Br. at 3 n.2.

Because of the bankruptcy proceeding, the control of Pilot stock, as it stood by the fall of 1997, was as follows: "Wyatt owned forty-five percent of the issued and outstanding stock of Pilot, Edwards' Chapter 7 Trustee controlled his thirty-three and one-third percent of Pilot's stock, and the balance of Pilot's stock was owned or controlled by Phillips, who also served as Pilot's President and Chief Executive Officer." *Edwards*, 2002 WL 1832814, at *2 (Finding of Fact ¶ 22). Therefore, Wyatt or Phillips could secure control of Pilot if they were able to obtain control over Edwards' stock in Pilot.

In December 1997, one of Wyatt's lawyers, Jay Ochroch, met with Edwards' lawyer, Braga, "to discuss a potential alignment between Edwards and Wyatt and the possibility of trying to effect a sale of Pilot." *Id.* (Finding of Fact ¶ 23). Following this meeting, Braga testified that a dinner meeting was held in Philadelphia in early January 1998 among Wyatt; his counsel, Ochroch; and Braga. JA 949. At this meeting, Braga sought to determine "why Mr. Edwards should trust" Wyatt given Wyatt's switch to side with Phillips in April 1995. *Id.*

Braga then arranged for a face-to-face meeting between Edwards and Wyatt. Edwards testified that, at that meeting, Wyatt explained his reasons for seeking to realign with Edwards. JA 755-56.

Following this meeting, Edwards and Wyatt entered into a Settlement Agreement on February 18, 1998. *Edwards*, 2002 WL 1832814, at *2 (Finding of Fact ¶ 25). The Settlement Agreement provided that Edwards and Wyatt "use their best efforts to cause Pilot to sell either all or substantially all of the assets of Pilot, the stock of Pilot, or cause an initial public offering [IPO] of the Pilot stock," and required that Edwards and Wyatt "attempt" to file a "Joint Motion" to secure the sale or initial public offering of Pilot or the conversion of the bankruptcy case to a Chapter 11 case. JA 30.[3]

After the Settlement Agreement was reached, Edwards

---

3. The Settlement Agreement contained a number of other provisions, one of which provided for compensation for Edwards. *See* JA 49, 51.

and Wyatt made concerted efforts to secure the Trustee's backing for an IPO of Pilot. The Trustee rejected the proposal, and the district court denied Edwards' and Wyatt's joint motion for the bankruptcy court to approve the IPO proposal. *See Edwards*, 2002 WL 1832814, at *3 (Findings of Fact ¶¶ 28, 30).

Instead, the Trustee determined that Edwards' stock in Pilot should be sold to Phillips: "On March 12, 1998, the Trustee filed her . . . 'Sale Motion'. . . . [T]he Trustee sought the sale of Edwards' Pilot stock to Phillips for $3.4 million and mutual releases by the estate and Pilot for various claims pending between the estate and Pilot." *Id.* (Findings of Fact ¶¶ 31-32).

### B.   The Unwritten "Handshake Agreement"

Following these events, Edwards and Wyatt entered into an unwritten "Handshake Agreement" on April 30, 1998, which Edwards claims Wyatt has breached.

> [W]hen it became apparent that Wyatt and Phillips were now involved in a bidding contest for Edwards' stock to avoid being in a minority position, Wyatt and Edwards agreed that neither would enter into any agreement with Phillips to settle the bankruptcy sale proceeding without the participation of the other party (the "Handshake Agreement").

*Id.* (Finding of Fact ¶ 33). This agreement "was never reduced to writing." *Id.* (Finding of Fact ¶ 35). The motivation for the Handshake Agreement differed from the purpose of the Settlement Agreement:

> The Handshake Agreement was totally different from the February 18th written [S]ettlement [A]greement. As Braga put it at trial: "By the time of the [H]andshake [A]greement, it was clear the two options in the written agreement, the IPO motion and [a] Chapter 7 to 11 conversion motion, were not going to work, so the written agreement . . . was fulfilled by that point in time. The [H]andshake [A]greement was an additional agreement made in light of the changed circumstances that those two things didn't work."

*Id.* (Finding of Fact ¶ 36). The Handshake Agreement involved a mutual exchange of promises: "The mutual consideration underlying this new agreement was: *Wyatt did not want Edwards to reach an agreement with Phillips any more than Edwards wanted Wyatt to reach an agreement with Phillips. By standing together, they were each stronger.*" *Id.* (Finding of Fact ¶ 37) (emphasis added).

The district court found that, according to the testimony of Ira B. Silverstein, one of Wyatt's attorneys, "under the Handshake Agreement, if either Wyatt or Edwards took an unreasonable position, the other party would no longer be bound by the Handshake Agreement." *Id.* (Finding of Fact ¶ 34).

Wyatt testified that the Handshake Agreement meant that Wyatt "would not settle the matter behind" Edwards' "back." JA 900. The district court then held that the Handshake Agreement was binding, and that "[t]he facts at trial established that *Wyatt's agreement with Phillips, without the participation of Edwards, would have been a breach of the Handshake Agreement.*" *Edwards*, 2002 WL 1832814, at *5 (Conclusion of Law ¶ 2) (emphasis added).

### C. *Wyatt and Phillips Make Competing Bids for Edwards' Stock*

In early May 1998, Wyatt tendered a bid of $3.6 million for Edwards' assets, but, as noted, the Trustee favored and supported Phillips' $3.4 million bid. *Id.* at *3 (Findings of Fact ¶¶ 38-39).

Over Edwards' objection, the bankruptcy court established procedures for a sale to go forward, and Wyatt submitted a new bid of $5 million. *Id.* at *3-*4 (Findings of Fact ¶¶ 40-41).

### D. *The Bankruptcy Court Hearing of July 29, 1998*

The Bankruptcy Court set a hearing date for July 29, 1998, for the purpose of selling Edwards' Pilot stock. Braga testified that, two days prior to the hearing, an attorney, Alan Davis, had entered the case. Davis represented Pilot's franchisees and employees and managers of Pilot (including

Phillips). JA 1020-21. Braga further testified that on July 28th, he received a call from Silverstein, Wyatt's counsel, in which Silverstein told him that Davis sought agreement of a continuance of the next day's hearing "so they could pursue global settlement talks." JA 1021. According to Braga, Silverstein asked Braga to agree to the continuance at the bankruptcy hearing, and Braga agreed to do so "because Mr. Wyatt and Mr. Edwards were aligned." JA 1021-22.

Phillips, in collaboration with Pilot's franchisees, offered a bid of $5.1 million. *Edwards*, 2002 WL 1832814, at *4 (Finding of Fact ¶ 42).

The bankruptcy court issued a continuance at the request of counsel for the Pilot franchisees and of Braga. *Id.* (Finding of Fact ¶ 43); *see also* JA 1478-80 (Tr. of Bankruptcy Court Hearing of July 29, 1998).

Edwards argues that this continuance request triggered new fissures in the relationship between Wyatt and him. According to the testimony of Kevin Brinkworth (Edwards' associate), Wyatt, who was present at the bankruptcy court hearing, "seemed somewhat confused," and said, " 'Why is this happening? Why is there a continuance? I wasn't aware of this. I wanted to buy this stock today.' " JA 840. Brinkworth testified that he informed Braga of Wyatt's reaction. *Id.* As Braga testified, "I was approached by Kevin Brinkworth who told me that he had just had a very disturbing conversation with Mr. Wyatt, who was upset about my agreeing to the continuance and blaming me for his inability for buying the shares that day." JA 1022.

Wyatt testified that he did not agree completely with Brinkworth's account of the meeting:

> My recollection is, I was confused by the continuance and still am and didn't understand why the continuance happened, but I do not recall speaking with you [Braga] and telling you that you ruined everything. I don't recall that conversation at all. I am not saying it didn't take place, but I don't recall that. . . .

> What I said to Mr. Brinkworth is I didn't understand the procedure that was taking place. I didn't understand what was going on.

JA 903.

Edwards testified that, at some time following the hearing, Wyatt

> told me that he was fully prepared to bid on the stock. That he had authorized his attorney, Mr. Ochroch, to bid up to $10 million and that he told me that he had a facility at Republic Bank for another $20 million and that the bidding didn't take place because he [Braga] screwed it up.

JA 775.

The district court found that "[a]lthough Braga claims there was some confusion over Wyatt's understanding of the July 29th continuance, Braga admitted at the time that Edwards would not have been prejudiced as a result of the continuance so long as the bids in place at the time were made irrevocable." *Edwards*, 2002 WL 1832814, at *4 (Finding of Fact ¶ 44). The district court also found that, as Edwards testified, "Wyatt had authorized Ochroch to bid up to $10 million for the Pilot stock." *Id.* (Finding of Fact ¶ 45).

### E. Braga's Letter of July 30

On July 30, 1998, Braga wrote

> to Ochroch and Silverstein expressing his concern about the relationship between Wyatt and Edwards because, "as a result of the July 29th hearing . . . Mr. Silverstein had instructed Mr. Wyatt not to talk to Mr. Edwards anymore and it's hard for two people to have an alignment going forward if you're not talking to each other."

*Edwards*, 2002 WL 1832814, at *4 (Finding of Fact ¶ 46).

In greater detail, this letter stated:

> I write to provide you with the benefit of my client's thoughts on where we are at this new juncture of our case. John [Edwards] perceives that the essential point

of your negotiations with the franchisees has to be to effectively offer his stock to the franchisees, in exchange for their agreement to participate in the management of the company as Wes [Wyatt] would like and to pursue Wes' idea of "rolling" them "up" into the company. John can understand why Wes might believe that these are valid business objectives to pursue, although John disagrees with them. Nonetheless, if this is the objective . . . then it *fundamentally changes the very premise of the cooperating relationship between John and Wes, which was designed to insure that John retained the benefit of his Pilot stock and then assisted Wes in controlling the company's future.* Neither John nor I would dispute that legitimate business-based beliefs might justify such a shift in the parties' relationship, but we both think that this apparent fundamental change in the nature of the relationship between he and Wes needs to be recognized up front and dealt with as such.

The reality of the events over the past twenty-four hours only heightens John's belief (and, in this case, mine as well) *that something fundamental has changed. In fact, those events confirm that there really is no ongoing relationship between John and Wes at this point in time.* By declining to continue John's consulting contract with Wes, by declining to make a good faith payment toward John's legal fees, by declining to allow John to speak with Wes, and by declining — as of the time of this writing — to have Wes confirm to me . . . that he understands that everything that happened in Court yesterday morning happened at Ira [Silverstein]'s direction, *John believes that you have effectively severed the relationship.* In particular, John believes that he and Wes had an express understanding that Wes would take care of John financially until this matter reached its conclusion; *in John's view, that understanding has now been breached* by the foregoing actions.

In the few hours since we have spoken, and as a result of my communicating the results of our conversation this morning to John (combined with yesterday's

results), John has gone over the edge. I have never seen him like this before, and I do not know if I can control him. Nothing would surprise me at this point. *If your plan is as John perceives it to be, then I would suggest that you make negotiating an endgame result with John your first and immediate priority. Otherwise, the game may be over as far as he is concerned, if it is not already.*

JA 67-68 (emphasis added).

### F. The Braga Letter of July 31, 1998

Braga testified that he sent another letter on the following day because he had received no response to the prior day's letter. JA 1026. In relevant part, this letter stated:

When I arrived at my office this morning, John Edwards was here and still very upset. We spent the morning discussing the circumstances in which John presently finds himself, and as a result of those discussions, *it is clear that there is no turning back from what John views as the breach of his relationship with Wes.*

In light of the foregoing, John has asked me to endeavor to *negotiate his own independent settlement* in this matter. I have been authorized to give you (and, thus, Wes) *a one-week period within which to conclude a settlement agreement with John. If such an agreement has not been concluded* within that time, then I have been directed to provide the same opportunity to Mr. Phillips, *which I will initiate on Friday, August 7th, if necessary.*

JA 69 (emphasis added).

Ochroch testified that, in his view, the July 30 letter and the July 31 letter:

together meant that there was going to be no cooperation between Mr. Edwards and Mr. Wyatt, all bets were off and Mr. Edwards could not force Wes Wyatt to pay him some amount of money beyond what

> he was bidding in open court, that Mr. Edwards was going to go to Mr. Phillips and try to make a deal for himself.

JA 1154. Silverstein, Ochroch's then-partner, testified that "[a]s I read this [July 31] letter, it terminated" the Handshake Agreement. JA 1221.

The district court found that "Wyatt *understood the July 31, 1998 letter to mean that the 'Handshake Agreement' was terminated*." *Edwards*, 2002 WL 1832814, at \*4 (Finding of Fact ¶ 48) (emphasis added). The district court held that this letter constituted a repudiation of the Handshake Agreement. *Id.* at \*5 (Conclusion of Law ¶ 4).

### G. Post-Letter Meeting in Early August

Edwards identifies several events that occurred after the July 31 letter. He argues that these events would constitute either a retraction of the repudiation or a new set of promises by Wyatt. The district court, however, made no findings related to these events, nor did it refer to them in its opinion. Accordingly, we are obliged to refer to evidence in the record as it relates to these events.

The first of these events was an August meeting. Braga testified that in response to his July 31 letter, he received a call from Ochroch inviting him to "come up to Philadelphia for a meeting to discuss the issues." JA 1027. This meeting occurred, according to Braga, in the "second week of August." *Id.*[4]

Braga testified that in addition to Ochroch and himself, this meeting was attended by Brinkworth; Wyatt; and Wyatt's counsel, Ochroch and Lane Fisher. *Id.* Edwards was not present, nor was Silverstein, another counsel for Wyatt. *Id.*

According to Braga, "[w]e talked through the issues and

---

4. In his proposed findings of fact submitted to the district court after trial, Wyatt stated that this meeting occurred on August 10, 1998. Defendant's Proposed Findings of Fact and Conclusions of Law at 10 (Proposed Finding of Fact ¶ 52).

there was in effect what I call a compromise resolution." JA 1027.

Ochroch testified that he remembered the meeting differently:

> Mr. Braga told us . . . that Mr. Wyatt was not supporting Mr. Edwards the way he should and he needed Mr. Edwards and if he wouldn't do it he was going to go over to Mr. Phillips and try to make a deal with Mr. Phillips. . . . We did not make a deal. We did not patch everything up. Everybody went their separate ways . . . .

JA 1156.

### H. August Meeting in Coffee Shop Between Edwards and Wyatt

Sometime in August, there was a meeting at a coffee shop in the building where Edwards resided. The district court did not discuss this meeting in its opinion.

Wyatt testified that at this coffee shop meeting, he and Edwards "discussed the possibility of my [outbidding] Mr. Phillips." JA 907. According to Edwards' testimony, at this meeting Wyatt said that

> *everything is back on track* and he said basically what transpired in this entire blowup or bump, it was *lawyers [posturing].* Lawyers have to justify their fees. . . . He said *nothing changed* in his mind [with respect to] what he wanted to do[. He] was *still on board* and he was fully prepared to go forward and bid on the stock, so *we can go forward with what he had proposed in February.* [i.e., the Settlement Agreement to sell the stock or assets of Pilot, *see supra*]

JA 776-77 (emphasis added).

Wyatt also agreed that he had made a comment that the lawyers were posturing. *See* JA 898-99 (Wyatt Testimony). Edwards testified that at this coffee shop meeting, Wyatt "asked me to arrange a meeting with [Braga] in Washington. He said he would like to go down and talk to [Braga] in Washington." JA 777.

### I. September 1998 Meeting in Washington with Edwards, Braga, Wyatt, and Phil Fisher

Edwards and Wyatt agree that such a meeting in Washington occurred in early September 1998. The district court did not discuss this meeting in its opinion, nor did it make findings.

Braga testified that several things were discussed at this meeting, including that:

> . . . we talked about Mr. Phillips and what he was up to and we talked about the possibility of a settlement. Mr. Wyatt told me that they were trying to have talks with the franchisees and if there was a global settlement *they would have to include Mr. Edwards*[,] which is what I understood, anyway.

JA 1032 (emphasis added).

Edwards testified that at the meeting in Washington they discussed "basically just reiterating that there were no problems and that the game plan was the same as it had been since February, that is, Mr. Wyatt's intention was to go forward and bid on and acquire the stock." JA 779.

Wyatt's testimony acknowledged that this meeting occurred. Wyatt's responses to questions asked by Braga (acting as counsel) provided Wyatt's view of the meeting:

> Q. Do you recall in that discussion or in any other discussion with Mr. Edwards asking him to arrange for you to come down to Washington and meet with me?
>
> A. I remember[ going] to Washington to meet with you.
>
> Q. *Do you remember that you requested Mr. Edwards to set that up?*
>
> A. *I believe I did, yes, sir.*
>
> Q. In fact you submitted an affidavit . . . that indicated that you came to Washington as a courtesy to me?
>
> A. *I was trying to come up with some way, if there was [a way], to make this thing work [] out.*

Q. Do you recall what we discussed in Washington?

A. Before lunch, *we discussed where we were and what was going on with Mr. Phillips and I think I was trying to find out — just explore, not find out, just explore, any options that I had discovered to try and figure out how to get this matter resolved.* . . .

Q. You had a [meeting] couple of weeks earlier with the franchisees that did not go very well?

A. Are you referring to the New York meeting. . . .

A. That meeting did not go well.

Q. We also discussed, what, if anything, Mr. Edwards might be able to do to help you in the Camden case?

A. That's correct.

Q. You were frustrated that case had not been resolved yet?

A. That's correct. . . .

Q. You brought counsel with you to Washington.

A. I brought Mr. Fisher. . . .

Q. Do you recall saying to me at the meeting in Washington that *if there was going to be a settlement as a result of the talks with the franchisees they would have to include Mr. Edwards*?

A. *Yes.*

Q. You said that to me?

A. I said that to you.

Q. In Washington?

A. *I think I said it more than once.*

JA 907-909 (emphasis added).

### J.  *Wyatt-Phillips Realignment and October 30 Hearing in Bankruptcy Court*

Braga testified that at the October 30 bankruptcy court hearing, outside the courtroom, Silverstein informed him that Wyatt and Phillips had settled. JA 1042.

The district court found that Wyatt and Phillips had made a joint bid: "On October 30, 1998, Wyatt and Phillips jointly offered a cash bid of $5.2 million, plus the claims settlement . . . pursuant to a Settlement Agreement entered into between Wyatt, Phillips and others." *Edwards*, 2002 WL 1832814, at *4 (Finding of Fact ¶ 51).

Later, over Edwards' objection, the Bankruptcy Court granted the Trustee's motion to sell Edwards's assets pursuant to Wyatt's and Phillips' joint bid. *Id.* at *5 (Finding of Fact ¶¶ 55-56).

## II.

Following these events, Edwards filed a complaint against Wyatt in the United States District Court for the District of Columbia on December 29, 1999, alleging breach of contract, promissory estoppel, and fraud and misrepresentation. *See* Compl. ¶¶ 58-76.[5] The case was transferred to the Eastern District of Pennsylvania. *See* Edwards Br. at 3 n.1. Wyatt filed an answer that denied most of the Complaint's allegations. The answer also listed several defenses, although, significantly, it did not identify nor specify repudiation as an affirmative defense. Wyatt also raised certain counterclaims, which the district court dismissed, *see* JA 209-23, and which are not the subject of any cross-appeal before us.

Following pre-trial proceedings, the district court held a four-day bench trial from May 6 to May 9, 2002. After receiving post-trial submissions from the parties, the district court issued its ruling on August 5, 2002, based on fifty-eight separate findings of fact and six conclusions of law.

*The district court made no findings of fact based upon the events and actions which took place subsequent to the July 31, 1998 letter, except for facts related to the October 30 bankruptcy hearing. Nor did the district court address*

---

5. The district court did not address Edwards' claim for fraud and misrepresentation. On appeal, Edwards has not challenged the district court's entry of judgment for Wyatt on this claim. Accordingly, this claim not having been raised before us, we do not discuss it.

*Edwards' alternate claim for relief based upon promissory estoppel.*

We reproduce the text of the district court's conclusions of law:

1.  The Handshake Agreement represented an enforceable promise. Wyatt and Edwards each mutually agreed not to enter into any agreement with Phillips without the participation of the other party. . . .

2.  The facts at trial established that Wyatt's agreement with Phillips, without the participation of Edwards, would have been a breach of the Handshake Agreement.

3.  Braga's July 30, 1998 letter did not establish that Wyatt had already breached the Handshake Agreement.

4.  The Handshake Agreement was repudiated by Braga's July 31, 1998 letter. An anticipatory breach of a contract occurs whenever there has been a definite and unconditional repudiation of a contract by one party communicated to another. . . . A statement by a party that he will not or cannot perform in accordance with agreement creates such a breach. . . . Braga's letter made clear Edwards' intent to terminate the Handshake Agreement before the time to perform had arrived. Braga threatened to negotiate with Phillips if Wyatt did not reply to the letter. Wyatt did not reply, and understood the letter to mean that the Handshake Agreement was terminated.

5.  The Handshake Agreement was not reformed, and a new agreement between Edwards and Wyatt was not reached.

6.  Wyatt did not waive his defense of repudiation. Wyatt was not required [to] raise repudiation as an affirmative defense in pre-trial pleadings. . . .

*Edwards*, 2002 WL 1832814, at *5 (Conclusions of Law ¶¶ 1-6) (citations omitted).

Based on these conclusions, the district court entered its final judgment in favor of Wyatt on August 5, 2002. Edwards filed a timely notice of appeal.

The district court had subject matter jurisdiction of this diversity action under 28 U.S.C. § 1332. We have jurisdiction over this appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291.

Edwards raises a number of challenges to the district court's decision. We review the district court's factual findings for clear error, but have plenary review of the district court's conclusions of law. *See Lanning v. Southeastern Pennsylvania Transp. Authority*, 308 F.3d 286, 290 (3d Cir. 2002).

## III.

The linchpin of the district court's ruling in favor of Wyatt is that Edwards, by Braga's transmittal of the July 31, 1998, letter, repudiated the Handshake Agreement. Edwards denies that the July 31 letter constituted an anticipatory repudiation that discharged Wyatt's obligations to perform under the Handshake Agreement.

## A.

Prior to challenging the district court's holding that the letter was a repudiation on the merits, however, Edwards argued that, procedurally, Wyatt's defense of repudiation was not properly before the district court. Edwards took the position that, contrary to the district court's holding, under Pennsylvania law[6] repudiation is an affirmative defense that must be pled in a defendant's answer. Because Wyatt did not plead repudiation as a defense, Edwards argues that he was denied an opportunity to undertake trial preparation

---

6. In this diversity case, we apply Pennsylvania's contract law. *See, e.g., Mellon Bank Corp. v. First Union Real Estate Equity and Mortg. Investments*, 951 F.2d 1399, 1405 (3d Cir. 1991); *see also Charpentier v. Godsil*, 937 F.2d 859 (3d Cir. 1991) ("Matters treated as affirmative defenses under state law are generally treated in the same way by federal courts in diversity cases.") (citations omitted).

with this defense in mind. Edwards claims that the district court should have held that Wyatt had waived his defense of repudiation by failing to plead it.

While Edwards and Wyatt argued and briefed the issues of affirmative defense and waiver, our disposition of this appeal, in which we reverse and remand on the merits on other grounds, makes it unnecessary for us to decide these uncertain issues of Pennsylvania law.[7] We therefore decline to predict how Pennsylvania courts would resolve these issues.

## B.

The district court drew the legal conclusion that the July 31 letter was a repudiation of the Handshake Agreement. *See Edwards*, 2002 WL 1832814, at *5 (Conclusion of Law ¶ 4). Edwards argues that the district court erred in holding that the letter constituted a repudiation, and that we should reverse the district court's judgment.

"[T]o constitute anticipatory breach under Pennsylvania law there must be 'an *absolute* and *unequivocal* refusal to perform or a distinct and positive statement of an inability to do so.'" *2401 Pennsylvania Ave. Corp. v. Federation of Jewish Agencies*, 489 A.2d 733, 737 (Pa. 1985) (quoting *McClelland v. New Amsterdam Casualty Co.*, 185 A. 198, 200 (Pa. 1936)) (emphasis added). As the Pennsylvania Supreme Court has said, though "[t]he rationale behind the rule of anticipatory repudiation is the prevention of economic waste," "we reject any argument suggesting a

---

7. *See State Farm Mut. Auto. Ins. Co. v. Coviello*, 233 F.3d 710, 716 (3rd Cir. 2000) ("review of Pennsylvania precedent demonstrates that we lack clear direction on this . . . issue . . . [A]s a federal court sitting in diversity, our task is to apply state law and not to form it . . . [and so] we will decline to make a prediction on this unsettled issue of state law."); *cf. Graphic Sales, Inc. v. Sperry Univac Div., Sperry Corp.*, 824 F.2d 576, 581 (7th Cir. 1987) ("As a federal court whose jurisdiction is based on diversity of citizenship, we are particularly hesitant to decide unsettled questions of state law unnecessarily.").

dilution of our long recognized standard of an 'absolute and unequivocal refusal to perform.' " *Id.* at 737.[8]

The district court's assessment of the July 31 letter, and its rationale in holding that Edwards had repudiated his agreement with Wyatt, does not meet the standard set by Pennsylvania of an "absolute and unequivocal refusal to perform." The district court found only that: (1) "Wyatt understood the July 31, 1998 letter to mean that the 'Handshake Agreement' was terminated," *Edwards*, 2002 WL 1832814, at *4 (Finding of Fact ¶ 48);[9] and (2) that "Braga's letter made clear Edwards' intent to terminate the Handshake Agreement before the time to perform had arrived. Braga threatened to negotiate with Phillips if Wyatt did not reply to the letter." *Id.* at *5 (Conclusion of Law ¶ 4).

However, neither of these determinations suffice to support a conclusion that Braga's July 31 letter should be viewed objectively as an *absolute, unequivocal* refusal to perform. Hence, the district court's holding that Edwards had repudiated the Handshake Agreement cannot be sustained.

8. As we have observed, Pennsylvania courts frequently follow the *Restatement of Contracts. See Livingstone v. North Belle Vernon Borough*, 91 F.3d 515, 539 (3d Cir. 1996), *cert. denied*, 520 U.S. 1142 (1997). The Pennsylvania Supreme Court has emphasized that Pennsylvania contract law imposes stricter requirements than does the Restatement for an anticipatory repudiation defense. *See 2401 Pennsylvania Ave.*, 489 A.2d at 737 n.7. Even so, Pennsylvania courts have relied upon the Restatement with respect to several issues relating to anticipatory repudiation. *See Empire Properties, Inc. v. Equireal, Inc.*, 674 A.2d 297, 305 (Pa. Super. Ct. 1996); *Oak Ridge Constr. Co. v. Tolley*, 504 A.2d 1343, 1346-47 (Pa. Super. Ct. 1985); *Jonnet Development Corp. v. Dietrich Industries, Inc.*, 463 A.2d 1026, 1031-32 & 1031 n.6 (Pa. Super. Ct. 1983).

9. Wyatt's subjective belief does not suffice to demonstrate repudiation. Pennsylvania courts would follow the *Restatement* and hold that repudiation must be apparent in an objective sense. The *Restatement (Second) of Contracts* requires that, "to constitute a repudiation, a party's language must be *sufficiently positive to be reasonably interpreted* to mean that the party will not or cannot perform." RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b (1981) (emphasis added).

Moreover, *even if* the district court had found that the July 31 letter represented an absolute, unequivocal refusal to perform, on this record such a finding alone would *still* be insufficient to support the district court's conclusion that there was a repudiation.

The record reveals that the events that followed the July 31 letter are highly significant and material in determining whether there was an anticipatory repudiation by Edwards. Even *if* the district court had considered these events — which bore on the issue of repudiation or reconstitution of an agreement — we cannot determine whether it did so. We are clear, however, that the district court failed to make *any* findings of fact which specifically relate to these events occurring between the July 31 letter and the October 30 bankruptcy hearing.[10] Most significantly, the district court's opinion makes *no* mention of Ochroch's telephone call to Braga following the July 31 letter and the subsequent meeting in Philadelphia during the second week of August among Ochroch, Braga, Wyatt, and others;[11] the coffee shop encounter between Edwards and Wyatt in August;[12] or the Washington meeting in September between Edwards and Wyatt and their counsel.[13]

The district court's failure to consider this evidence and to make the requisite findings concerning these post-July 31 events renders the district court's legal conclusion of repudiation erroneous.

First, though "[m]ere expression of doubt as to . . . willingness or ability to perform is not enough to constitute a repudiation," RESTATEMENT § 250 cmt. b, the recipient of a doubt-creating statement may seek adequate assurances that the other party will perform. *Id.* § 251. The telephone

---

10. As we have explained in Part I, *supra*, the record contains evidence of these events. Moreover, both Edwards and Wyatt discussed these events in their post-trial submissions. *See* Plaintiff's Findings of Fact and Conclusions of Law at 13-17; Defendant's Proposed Findings of Fact and Conclusions of Law at 10-12 (Proposed Findings of Fact ¶¶ 52-59).

11. *See* Part I(G), *supra*.

12. *See* Part I(H), *supra*.

13. *See* Part I(I), *supra*.

call by Ochroch following the July 31 letter and the subsequent August 10 meeting bear heavily on attempts to secure adequate assurances, and the record may well be read to reflect that such assurances were given. But the district court's opinion does not refer to these events, and therefore we must conclude that the district court did not consider this issue.

Second, even if the July 31 letter constituted an effective repudiation — which we seriously doubt in light of the lack of findings to the effect that it was absolute and unequivocal — the events that occurred after Braga faxed the July 31 letter may well have been deemed, if considered, a "nullification" of the "repudiation." As the *Restatement* explains, a repudiation may be nullified by a retraction if the injured party is made aware of the retraction before he has prejudicially changed his position:

> (1) The effect of a statement as constituting a repudiation under § 250 or the basis for a repudiation under § 251 is *nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation* or *indicates to the other party that he considers the repudiation to be final.*

> (2) The *effect of events other than a statement* as *constituting a repudiation* under § 250 or the basis for a repudiation under § 251 *is nullified if*, to the knowledge of the injured party, *those events have ceased to exist* before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final.

RESTATEMENT § 256 (emphasis added).

The record is replete with evidence of events that, if considered by the district court, could lead to a holding that any "repudiation" was nullified. *See also* RESTATEMENT § 256 cmt. b ("It is not necessary for the repudiator to use words in order to retract his statement. Conduct, such as an offer of performance, may be adequate to convey the idea of retraction to the injured party."). In particular, the August meeting in Philadelphia; Wyatt's statement at the

coffee shop meeting that "everything is back on track" and that "nothing [had] changed in his mind," JA 776-77 (Edwards Testimony — not disputed by Wyatt);[14] and the September meeting in Washington at which Wyatt stated that Edwards would be included in a settlement involving the franchisees, *see* JA 909 (Wyatt Testimony), is significant and material evidence that Wyatt recognized that the repudiation (if any) had been nullified and retracted.

While we do not find as a fact,[15] and do not hold, that these post-July 31 events were equivalent to a nullification of repudiation (if repudiation there was), we can, and do hold, that the district court was *required to consider* the record evidence of these events before concluding that a repudiation had occurred. *See Logue v. Int'l Rehabilitation Assocs., Inc.*, 837 F.2d 150, 155 (3d Cir. 1988) (district court must consider all relevant evidence in order to make its findings of fact and conclusions of law).

Since the district court did not refer to the relevant evidence we have cited, and did not make findings of fact concerning the post-July 31 events, it could not determine whether the "repudiation" that it had found had been nullified. Because the district court did not consider all of the material evidence, its conclusions were necessarily erroneous.

## C.

Edwards also contends that even if the district court did not err in concluding that the July 31 letter constituted a repudiation, it erred in holding that Edwards and Wyatt did

---

14. According to Edwards' testimony, Wyatt said that

> *everything is back on track* and he said basically what transpired in this entire blowup or bump, it was *lawyers [posturing]*. Lawyers have to justify their fees. . . . He said *nothing changed* in his mind [with respect to] what he wanted to do[. He] was *still on board* and he was fully prepared to go forward and bid on the stock, so *we can go forward with what he had proposed in February.*

JA 776-77 (emphasis added).

15. *See In re LifeUSA Holding Inc.*, 242 F.3d 136, 149 (3d Cir. 2001) ("we [appellate courts] are not factfinders").

not reach a new, enforceable agreement after the July 31 letter.

Upon our review of the record, we hold that the district court erred in concluding that "[t]he Handshake Agreement was not reformed, and a new agreement between Edwards and Wyatt was not reached." *Edwards*, 2002 WL 1832814, at *5 (Conclusion of Law ¶ 5). As we have explained, the district court did not make any findings of fact concerning the dealings among Edwards, Wyatt, and their counsel following the July 31 letter. The district court made only one, conclusory finding that could form the basis of this conclusion: "There is no evidence that Wyatt and Phillips [sic] entered into a new agreement following Braga's July 31, 1998 repudiation letter." *Id.* at *4 (Finding of Fact ¶ 50).[16]

Even assuming that the July 31 letter was a repudiation — and that such a repudiation was not nullified by subsequent communications or conduct between Edwards and Wyatt — the district court was obliged to determine whether a new contractual agreement was reached on the basis of the post-July 31 meetings of the parties and their counsel.

As we have recounted, the district court made no reference in its opinion or findings to the relevant post-July 31 evidence, although the record reveals substantial and material evidence taken at trial. A fair reading of the record can only lead to the conclusion that the testimony adduced at trial was highly relevant not only to the issue of nullification, but also as to whether the parties had formed a new contract. The district court therefore erred because, indeed, there was evidence in the record which bears on the formation of a new agreement.

We have required that the district court make "subordinate" factual findings in support of its "ultimate" findings so as to allow us to ascertain "what evidence the district judge accepted as credible or what he rejected." *O'Neill v. United States*, 411 F.2d 139, 146 (3d Cir. 1969). We went on to say that subordinate

---

16. Presumably the district court meant to refer to Wyatt and *Edwards*, not Wyatt and *Phillips*.

findings may not be left unarticulated. If they actually were reached in the process of arriving at the ultimate factual conclusion, they must be stated. If they did not enter into the process by which the ultimate factual finding was made, then it was without any supporting foundation. In either case, therefore, *it is necessary that the trial court specify these subordinate facts upon which the ultimate factual conclusion must rest.*

*Id.* (emphasis added). Here, the district court failed to comply with the requirements leading to appropriate factual findings and conclusions of law. Hence, we cannot sustain the district court's holding that no new agreement was reached, just as we cannot sustain, without more, the district court's determination that the July 31 letter constituted a repudiation.

## IV.

Count Two of Edwards' Complaint contains an alternative promissory estoppel claim. *See* Compl. ¶ 65-71. In that count, Edwards asserts that "Wyatt intended or knew — or reasonably should have expected — that those promises would induce action or forbearance from action by Wyatt," and that "Wyatt's promises to Edwards did in fact induce both action and forbearance from action by Edwards." *Id.* ¶¶ 66, 67. Edwards further asserted that "Wyatt benefited greatly through the action and forbearance from action that his promises induced in Edwards." *Id.* ¶ 68.

Edwards now argues that the district court erred in failing to address his promissory estoppel issue, and that, even if we were to uphold the district court's conclusion that Edwards had repudiated the Handshake Agreement — which we have not done — we must remand the case for the district court to resolve the promissory estoppel claim. On the other hand, Wyatt argues that the district court implicitly addressed that issue.[17]

---

17. At oral argument, Wyatt's counsel responded to our questions about the promissory estoppel issue:

> THE COURT: . . . [S]hould [the district court] have done something about the promissory estoppel count? Or is that also implicit in what he has said?

We reject Wyatt's argument that we should presume that the district court must have considered the promissory estoppel issue notwithstanding its failure to mention it anywhere in its opinion. The issue of promissory estoppel was properly before the district court. As noted previously, Edwards' Complaint contained a second count based on promissory estoppel. Both Edwards and Wyatt referred to promissory estoppel in their respective pre-trial memoranda. Edwards' Proposed Findings of Fact and Conclusions of Law, filed with the district court at the conclusion of evidence, identified the elements of promissory estoppel, *see* Plaintiff's Findings of Fact and Conclusions of Law at 19, and sought relief on the promissory estoppel claim. *See id.* at 23. Wyatt also responded to the promissory estoppel issue in his Proposed Findings of Fact and Conclusions of Law.[18]

Thus, the issue was properly before the district court. We can only assume that the district court neither considered the elements of this issue, nor the evidence that bore on this issue, inasmuch as the district court's opinion is completely silent respecting the claim of promissory estoppel. In the absence of factual findings or *any* legal

---

MR. ZUCKER: I think it's implicit in what he said. It would have been —

THE COURT: In other words, district judges can[ ]not say anything, but we are to find their reasoning, their findings of fact and their conclusions of law from what they don't say.

MR. ZUCKER: Honestly, I would have been happier with a more detailed recitation. . . .

THE COURT: Don't you think he should have at least ruled on it, right, wrong, or indifferent?

MR. ZUCKER: Yes, it would have been nice. It would have been nice.

Tr. of Oral Arg. at 24-25.

18. *See* Defendant's Proposed Findings of Fact and Conclusions of Law at 14 (Proposed Conclusion of Law ¶ 2); *id.* at 16 ((Proposed Conclusion of Law ¶ 20).

conclusions related to promissory estoppel, we cannot review the district court's judgment as to this issue.

Moreover, we conclude that there was evidence in the record that could support Edwards' promissory estoppel claim. Pennsylvania has adopted the *Restatement* view of promissory estoppel. As the Pennsylvania Supreme Court has explained:

> [U]nder the doctrine of promissory estoppel . . . "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

*Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc.*, 636 A.2d 156, 160 (Pa. 1994) (quoting RESTATEMENT § 90(1)). Under Pennsylvania law, to make a claim for promissory estoppel,

> the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.

*Crouse v. Cyclops Industries*, 745 A.2d 606, 610 (Pa. 2000).

The evidence at trial discloses that there is a factual basis for Edwards' promissory estoppel claim. The alleged promises could have arisen from Wyatt's statements post-dating the purported repudiation letter. Edwards testified that, at the August coffee shop meeting, Wyatt said that things were "back on track" and that "nothing [had] changed." JA 776-77 (Edwards Testimony). Such statements, as well as statements made during the August meeting in Philadelphia and the September meeting in Washington, could well constitute promises that induced Edwards' reliance. Furthermore, Edwards did testify that he relied on Wyatt's promises to his detriment by forbearing from other negotiating opportunities. *See* JA 782-83.

Again, we are not stating that the record requires the district court to hold that Edwards has met the burden of establishing promissory estoppel. We venture no opinion on that subject. Rather, our review is unavailable, and must lead to a remand, because the district court failed to address this claim in the first instance.

## V.

We have been obliged to reverse the judgment of the district court entered on August 5, 2002. Our review of the district court's opinion and the record reveals to us that the district court could not have rendered a judgment in favor of Wyatt based upon either repudiation or the absence of a new agreement, without considering the entire record, and without furnishing us with the findings of fact and conclusions of law as required by our precedents. Moreover, Edwards' alternative claim based on promissory estoppel was nowhere addressed by the district court, although it was a viable issue in the pleadings and at trial.

Accordingly, we will REVERSE the judgment of the district court and will REMAND this case for a new trial in accordance with the foregoing opinion.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*