

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-20-2009

# Edwards v. Wyatt

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-1466

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Edwards v. Wyatt" (2009). *2009 Decisions.* Paper 1349.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1349

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos.  07-1466 & 07-1602
_____

JOHN JOSEPH EDWARDS,
                    Appellant in 07-1602


v.

A. WESLEY WYATT,
                    Appellant in 07-1466


_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No.  01-cv-01333)
District Judge: Honorable Petrese B. Tucker


_____

Argued November 20, 2008
Before: SMITH, HARDIMAN, and ROTH, *Circuit Judges*.

(Filed:  May 20, 2009)

Stephen L. Braga [Argued]
Ropes & Gray
700 12th Street, N.W.
One Metro Center, Suite 900
Washington, DC 20005
        *Attorney for John Joseph Edwards*

Jeffrey A. Zucker [Argued]
FisherZucker
21 South 21st Street
Philadelphia, PA 19103

Paul J. Cianci, Esq.
FisherZucker
21 South 21st Street
Philadelphia, PA 19103
  *Attorneys for A. Wesley Wyatt*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

  This case comes to us for the third time. Some ten years ago, John Joseph Edwards sued his former business partner, A. Wesley Wyatt, for breaching an oral agreement (the Handshake Agreement). In *Edwards v. Wyatt*, 335 F.3d 261 (3d Cir. 2003) (*Edwards I*), we reversed the District Court's ruling that Edwards anticipatorily repudiated the Handshake Agreement. Following a second bench trial, which produced the same result as the first trial, we reversed again, explaining that the District Court's factual findings were still inadequate to sustain its legal conclusion that Edwards anticipatorily repudiated the Handshake Agreement. *See Edwards v. Wyatt*, No. 04-3325, 2005 WL 1349531 (3d Cir. June 8, 2005) (*Edwards II*). After a third bench trial, the District Court held that Edwards had *not* anticipatorily repudiated the Handshake Agreement, and that Wyatt had breached it. *See Edwards v. Wyatt* (*Edwards '06*), No.

2

01-1333, 2006 WL 2945224 (E.D. Pa. Oct. 10, 2006). Ultimately, the court awarded Edwards $5,482,500. *See Edwards v. Wyatt* (*Edwards '07*), No. 01-1333, 2007 WL 136687 (E.D. Pa. Jan. 8, 2007). This time, Wyatt appeals and Edwards cross-appeals.

I.

In 1993, Edwards was President of Pilot Air Freight Corporation (Pilot). Pilot needed capital to remain financially stable and received a $2 million loan and personal guaranty from Wyatt, who had been introduced to Edwards by Pilot's lawyer, Richard Phillips. In exchange, Wyatt and Phillips became members of Pilot's Board of Directors and acquired stock options (45% for Wyatt and 21.67% for Phillips). Edwards retained an option on the remaining 33.33% of Pilot's shares. In addition, Phillips became Pilot's Chief Executive Officer while Edwards retained his position as President and Director of Pilot and entered into a three-year employment agreement with the company.

The relationship among the three men soon disintegrated and Edwards was terminated in 1995. Edwards then filed for bankruptcy under Chapter 11 and listed his one-third interest in Pilot on his schedule of assets. The case was eventually converted to Chapter 7, and the Trustee assumed control of Edwards's assets, including his Pilot stock. *See In re Edwards*, 228 B.R. 552 (Bankr. E.D. Pa. 1998).

In February 1998, Edwards and Wyatt executed a written settlement agreement whereby they would collaborate to settle Edwards's bankruptcy while Edwards received a

3

weekly salary as a consultant for one of Wyatt's companies until August 7, 1998. In April 1998, the Trustee took steps to sell Edwards's Chapter 7 assets. When it became clear that Wyatt and Phillips would be in a bidding contest for Edwards's stock, however, Edwards and Wyatt entered into the Handshake Agreement which prohibited either man from reaching a unilateral agreement with Phillips.

On July 29, Wyatt and Phillips informed the Bankruptcy Court that they were in discussions to submit a joint bid. Wyatt communicated this to Edwards and informed him that he would not continue their consulting arrangement past August 7. Edwards quickly became concerned with Wyatt's relationship with Phillips and ordered his attorney, Stephen Braga, to send a letter to one of Wyatt's attorneys, Jay Ochroch, on July 30, which read, in relevant part:

> The reality of the events over the past twenty-four hours only heightens [Edwards's] belief . . . that something fundamental has changed. In fact, those events confirm that there is no ongoing relationship between [Edwards] and [Wyatt] at this point in time. . . . [Edwards] believes [Wyatt] ha[s] effectively severed the relationship. . . . I would suggest that you make negotiating an end game result with [Edwards] your first and immediate priority. Otherwise, the game may be over as far as he is concerned; if it is not already.

The next day, having not heard from Ochroch or Wyatt, Braga sent Ochroch a second letter, in which he stated that "[Edwards] views [Wyatt's refusal to communicate and renew the consulting agreement] as [a] breach of his relationship," and stated that Braga had "been authorized to give [Wyatt] a one-week period within which to conclude a settlement agreement with [Edwards]." Wyatt contends that he understood this letter to

4

mean that Edwards had determined there was no more relationship between Edwards and Wyatt and that the Handshake Agreement had been repudiated. However, in mid-August 1998, Wyatt and Edwards met face-to-face and Wyatt reassured Edwards that "nothing had changed," and asked Edwards to set up a meeting so that he could communicate this to Braga. Edwards did so, and the following month Wyatt reconfirmed the essence of the Handshake Agreement — specifically, that any settlement between Wyatt and Phillips would need to include Edwards. In reliance upon these assurances, Edwards did not seek out another investor.

Despite the Handshake Agreement, on October 30, 1998, Wyatt and Phillips advised the Bankruptcy Court of a settlement, and jointly offered a cash bid of $5.2 million for Edwards's Pilot stock and related assets. Edwards objected to the joint bid as an illegal collusive effort to control the sale price for his assets in the Bankruptcy Court. On December 15, 1998, the Bankruptcy Court denied Edwards's objection and permitted the sale of his assets. Because the sale proceeds exceeded the estate's debts, all of Edwards's creditors were paid, and Edwards received the balance of approximately $3,000,000. At the end of the day, Wyatt and Phillips each held 50% of Pilot's stock.

Edwards sued Wyatt, asserting claims of breach of contract, promissory estoppel, and fraudulent misrepresentation. After two bench trials were reversed because of insufficient findings of fact, the case was remanded to consider two issues: (1) whether Edwards anticipatorily breached or terminated the Handshake Agreement, and, if not; (2)

5

whether Edwards was entitled to damages. After a two-day bench trial, the District Court ruled in Edwards's favor, concluding that Braga's letters were not sufficiently absolute or unequivocal to constitute anticipatory breach. Because Edwards had not repudiated or terminated the Handshake Agreement, the District Court found that Wyatt breached the contract in October 1998 by settling with Phillips without Edwards's participation.

As for damages, the District Court determined that because Wyatt profited $12,900,000 from the settlement of Edwards's bankruptcy estate, Edwards suffered damages of $4,290,000 (one-third of Wyatt's profits, which reflected Edwards's one-third share in Pilot). The District Court later amended that figure to $5,482,500, to reflect Edwards's and Wyatt's respective shares of Pilot. Wyatt now appeals with regard to both liability and damages and Edwards cross-appeals on the issue of damages.[1]

II.

A.

As a preliminary matter, Wyatt argues that the Handshake Agreement was unenforceable and void *ab initio* under Pennsylvania law because Edwards concealed it as an asset from the Trustee in violation of 18 U.S.C. § 152(6). Edwards argues that this

---

[1] The District Court had diversity jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's legal conclusions, but review the District Court's factual findings for clear error. *Lansing v. Se. Pa. Transp. Auth.*, 308 F.3d 286, 290 (3d Cir. 2002).

6

claim has been waived and is without merit. We agree with Edwards that Wyatt has waived this claim.

The only two issues presented to the District Court during the third trial were: (1) whether Edwards anticipatorily repudiated or terminated the Handshake Agreement and, if not; (2) whether Edwards was entitled to damages. Only in his summation following the third trial did Wyatt ever raise this issue of unenforceability and even the District Court noted that it appeared to be waived. Furthermore, when Wyatt reargued this issue in a motion for reconsideration, the court again noted that it appeared to be waived, and then denied the claim on its merits. *See Edwards '07*, 2007 WL 136687, at *4-5.

Issues not raised in the district court are waived. *Ogden Fire Co. No. 1 v. Upper Chichester Twp.*, 504 F.3d 370, 381 (3d Cir. 2007). "Absent exceptional circumstances, this Court will not consider issues raised for the first time on appeal." *Del. Nation v. Pennsylvania*, 446 F.3d 410, 416 (3d Cir. 2006). Exceptional circumstances would include a showing that the public interest requires that the issues be heard or that manifest injustice would result from the failure to consider such issues. *Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001). Because no such exceptional circumstances are apparent here, we decline to reach the merits of this issue and conclude that Wyatt waived the defense that the Handshake Agreement was void. *See Massey-Ferguson Credit Corp. v. Webber,* 841 F.2d 1245, 1249 (4th Cir. 1988) (defense to breach of contract action untimely where it was not raised until the third trial).

B.

Assuming *arguendo* that the Handshake Agreement was valid, Wyatt asserts that the District Court erroneously found — in contrast to the first two trials — that Edwards did not repudiate it. *See Edwards '06,* 2006 WL 2945224 at *8. Wyatt insists that Braga's letters of July 30 and 31, 1998 either repudiated or terminated the Handshake Agreement. We disagree.

In *Edwards I*, we stated the legal standard that the District Court was required to apply when addressing the issue of repudiation: "To constitute anticipatory breach under Pennsylvania law there must be an *absolute* and *unequivocal* refusal to perform or a distinct and positive statement of an inability to do so." 335 F.3d at 272 (quoting *2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies*, 507 Pa. 166, 172 (1985)) (emphasis in original) (internal quotation marks omitted). We noted further that Wyatt's subjective belief would not suffice to demonstrate repudiation, and explained that Pennsylvania courts would require repudiation to "be apparent in an objective sense." *Id.* at 273 n.9.

In its 2006 opinion, the District Court emphasized the extensive use of terms such as "if," "belief," "believes," and "views" in Braga's letters. *See Edwards '06,* 2006 WL 2945224 at *6 (Findings of Fact Nos. 34 and 36). After considering the surrounding factual circumstances, the court concluded this language was too equivocal to constitute a repudiation, and found that Braga's letters were instead demands for assurance that Wyatt intended to adhere to the Handshake Agreement. *See id.* at *6 (Finding of Fact No. 37)

8

and *8-9 (Findings of Law Nos. 4-8). Accordingly, the court found that these letters did not terminate the Handshake Agreement.

Although the tone of the letters is stern, and notwithstanding that at least one of them contains an ultimatum, an objective reader of Braga's letters would not believe that Edwards had repudiated the Handshake Agreement. Accordingly, we find no error in the District Court's finding that Edwards did not repudiate the Handshake Agreement. [2]

## C.

Wyatt next argues that the District Court failed to provide subordinate factual findings to support its conclusion. This is the flaw that required us to reverse the District Court in *Edwards I* (where we found that District Court's findings omitted *any* discussion of the effect of the July 30 and 31, 1998 letters) and *Edwards II* (where we concluded that the court's findings of fact were still insufficient because they failed to explain which findings were germane to the question whether those two letters had *objectively*

---

[2] In addition to reviewing Braga's letters, the District Court properly determined that the parties' interaction after July 31 was consistent with a lack of repudiation. Wyatt met Edwards in early August and agreed to continue giving Edwards some of the benefits of the February 1998 consulting agreement, including health insurance and the use of one of Wyatt's cars. *See Edwards '06,* 2006 WL 2945224 at *6. Furthermore, Wyatt met with Edwards a second time and explained that "as far as he was concerned, nothing had changed, we were going forward with the same plan." *Id.* at *7. Finally, in a face-to-face meeting with Edwards and Braga on September 1, 1998, Wyatt confirmed that any settlement would need to include Edwards. *Id.* Wyatt's conduct and assurances are inconsistent with his contention that he took Braga's letters to be a repudiation of the Handshake Agreement.

repudiated the Handshake Agreement). This time the District Court's findings of fact were sufficiently detailed to permit judicial review.

As we noted in *Edwards I*, "[w]e have required that the district court make 'subordinate' factual findings in support of its 'ultimate' findings so as to allow us to ascertain what evidence the district judge accepted as credible or what he rejected." *Edwards I,* 335 F.3d at 275 (citation and internal quotation marks omitted). We explained that subordinate findings "may not be left unarticulated," at least where they "actually were reached in the process of arriving at the ultimate factual conclusion." *Id.* (citation omitted). Where a court's subordinate factual findings are insufficient, we "review the district court's ultimate factual findings under a standard more stringent than the clearly erroneous standard ordinarily applicable to such findings." *United Steelworkers of Am., AFL-CIO v. N.J. Zinc Co., Inc.*, 828 F.2d 1001, 1009 (3d Cir. 1987).

Wyatt's opening brief identified ten subordinate findings that he believed the District Court failed to make. Each of the first three factual determinations that Wyatt identifies corresponds to an ultimate factual finding actually contained in the District Court's order. *See Edwards '06* at *3-8. The seven other subordinate findings need not have been made because they became irrelevant once the District Court determined that there was no anticipatory repudiation and that Wyatt was in breach. Wyatt points to no authority that requires district courts to make *irrelevant* subordinate factual findings; indeed, such a requirement would run contrary to the purpose of a subordinate finding of

10

fact. *See Edwards I*, 335 F.3d at 275; *cf. Logue v. Int'l Rehab. Assocs., Inc.* 837 F.3d 150, 155 (3d Cir. 1988) (requiring the district court to consider all "relevant" evidence in making its findings of fact and conclusions of law). Accordingly, we conclude that the District Court's subordinate findings of fact are sufficient to permit judicial review of its ultimate conclusions.

## III.

Having determined that the District Court did not err with regard to liability, we turn now to the complicated issue of damages.

## A.

Wyatt argues that Edwards has not proven his damages to a reasonable certainty, and insists that the District Court erred in using a pro rata formula for measuring Edwards's damages.

## 1.

Pennsylvania law requires a plaintiff seeking damages for breach of contract to establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). A party is entitled to recover whatever damages it suffered, provided they would naturally and ordinarily result from such a breach, or the damages were reasonably foreseeable and within the contemplation of the parties at the time of contracting and can be proved with reasonable certainty.

*Ferrer v. Trs. of Univ. of Pa.*, 573 Pa. 310, 341 (2002). "Reasonable certainty embraces a rough calculation that is not too speculative, vague or contingent upon some unknown factor." *Ware v. Rodale Press, Inc.* 322 F.3d 218, 225-26 (3d Cir. 2003) (citations and internal quotation marks omitted). Moreover:

> Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

*Liss & Marion, P.C. v. Recordex Acquisition Corp.,* 937 A.2d 503, 514 (Pa. Super. 2007) (citations omitted). In addition, the Restatement of Contracts — which Pennsylvania courts follow, see *Edwards I*, 335 F.3d at 272 n.8 — provides that "[d]oubts are generally resolved against the party in breach," and the court may "require a lesser degree of certainty," depending upon the circumstances of the breach. RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981). Thus, absolute precision is not required. *See Bigelow v. RKO Radio Pictures Inc.,* 327 U.S. 251, 264 (1946); *accord Berg Chilling Sys., Inc. v. Hull Corp.,* 369 F.3d 745, 764 (3d Cir. 2004). Otherwise, we risk leaving the injured party without a remedy.

Wyatt argues that Edwards has not proved his damages because the Handshake Agreement did not contain a term whereby Edwards would receive *anything* in the settlement contemplated among Edwards, Phillips, and Wyatt. However, it is undisputed that Edwards was deprived of consideration for this agreement, *i.e.*, the value of his

promise not to reach a unilateral agreement with Phillips. *See Edwards '06*, 2006 WL 2945224 at *5. Edwards reasonably relied on Wyatt's assurances that he would abide the Handshake Agreement, and he was damaged when Wyatt settled with Phillips in contravention of that agreement. *See Edwards '06*, 2006 WL 2945224 at *7-8. Accordingly, the District Court did not err in holding that Edwards was damaged by Wyatt's breach.

2.

We turn to the methodology used by the District Court to determine Edwards's damages. It calculated the amount that Wyatt realized by virtue of the breach and then apportioned Wyatt's earnings between Edwards and Wyatt based on their relative ownership of Pilot. As Wyatt did not offer the District Court a competing theory of damages,[3] the District Court concluded that Edwards's loss could be calculated by determining the parties' shared interest in Pilot — 33.33% for Edwards, and 45% for Wyatt, for a total of 78.33% — and concluding that the ratio of that shared interest controlled by Edwards was 42.5% (dividing 33.33% by 78.33% for a total of 42.5%). The District Court then calculated the economic benefit Wyatt received as a result of his breach of the Handshake Agreement and awarded Edwards 42.5% of that amount.

---

[3] Wyatt proposes a different method of calculation in his opening brief, but he did not raise this theory in the District Court. Accordingly, the argument is waived. *See Ogden Fire,* 504 F.3d at 381; *see also Delaware Nation,* 446 F.3d at 416.

We find no error in this approach. Although the record supports Wyatt's contention that the Handshake Agreement itself does not yield a measure of damages, we do not find this to be dispositive. Pennsylvania law permits courts to imply a missing term in a parties' contract "when it is necessary to prevent injustice and it is abundantly clear that the parties intended to be bound by such term." *Solomon v. U.S. Healthcare Sys. of Pa., Inc.* 797 A.2d 346, 350 (Pa. Super. Ct. 2002) (citation omitted). Under the Restatement, Pennsylvania courts will supply a reasonable missing term based on "a tacit agreement or a common tacit assumption or where a term can be supplied by logical deduction from agreed terms and circumstances." RESTATEMENT (SECOND) OF CONTRACTS §204 cmt. c (1981). When a court cannot find an agreement as to a particular term based on principles of contractual interpretation, "a term which is reasonable in the circumstances is supplied by the court." *Id.* at § 204. Given the course of dealing between the parties — which presumed their respective percentages of ownership in Pilot shares — we cannot say that the District Court's method of calculation was unreasonable. The District Court attempted to enforce Wyatt's broken promise by protecting the expectation that Edwards had when he made the contract. *Id.* at § 344, cmt. a. "[The court] does this by attempting to put him in as good a position as he would have been in had the contract been performed, that is, had there been no breach." *Id.* In this case, Edwards expected to share in the post-bankruptcy success of Pilot on a pro rata basis with Wyatt and the District Court so found.

Wyatt's citation to *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659 (3d Cir. 1998), is inapposite. *ATACS* involved a breach of a teaming arrangement between a prime contractor and a subcontractor. When the prime contractor's bid was accepted, it turned its back on the teaming arrangement in favor of a cheaper subcontractor to improve its profit margin. 155 F.3d at 662-64. We held that ATACS's expectancy was too speculative because the agreement was only preliminary and failed to include a contract price, financing fees, and other terms; the District Court had "absolutely no basis" for valuing ATACS's lost profits under the subcontract. *Id.* at 670. Because the parties "were far from agreeing" on these critical terms, we found ATACS was precluded from demonstrating its expectancy. *Id.*

By contrast, we are not dealing here with lost profits, but with the evaluation of an income-producing asset with an ascertainable market value. This difference is crucial. *See Schonfeld v. Hilliard,* 218 F.3d 164, 176 (2d Cir. 2000) (explaining that "lost profit" and "lost asset" damages are legally distinct: "When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value of the asset at the time of breach — not the lost profits that the asset could have produced in the future."). Although the Handshake Agreement did not contain a damages provision, the course of dealing among the parties — which always assumed their bargaining strength would be based on their respective percentages of ownership in Pilot — was sufficient to supply the missing term.

15

Although the terms of that settlement doubtless would have allocated the former Pilot assets differently among Edwards, Phillips, and Wyatt, it was not unreasonable to assume that the total size of the "pie" at stake in that settlement — including the post-bankruptcy value of the Pilot shares — would be unaffected by Edwards's involvement. [4] Accordingly, calculating Edwards's expectancy by comparing his and Wyatt's pre-settlement stakes in Pilot was a fair and principled way to determine Edwards's expectancy under the Handshake Agreement.

3.

Although we agree Edwards was entitled to damages and the District Court used an appropriate formula, we find that the District Court erred in calculating Wyatt's economic benefit to determine Edwards's pro rata share. In other words, the pie was split appropriately, but it was the wrong size pie. Specifically, we find that the District Court failed to account for the fact that Wyatt owned 45% of Pilot prior to his agreement with Phillips. Because Wyatt and Phillips each controlled 50% afterwards, Wyatt netted only 5% of Pilot's shares by breaching the Handshake Agreement.

---

[4] We reject Wyatt's contention that Edwards's involvement in the discussions would have scuttled *any* settlement among the three businessmen. To indulge in such speculation would be to assume that the Handshake Agreement was either not a binding agreement at all, or that its terms became impracticable by October 1998 (when Wyatt and Phillips reached their private settlement) simply because of the personalities involved. We reject both assumptions because either of them would be inconsistent with the District Court's finding that the Handshake Agreement was valid and enforceable at the time Wyatt breached it. *See Edwards* '06, 2006 WL 2945224 at *8.

16

In his brief and again at oral argument, Edwards contended that Wyatt did not in fact own 45% of Pilot because that ownership was contested and "there was a substantial and gathering cloud over [the] 45 shares." This contention is at odds with Edwards's position opposing the Wyatt-Phillips bid in the Bankruptcy Court, where Edwards stated that "Wyatt received a 5% increase in his ownership control of Pilot." Having taken this position in the Bankruptcy Court, Edwards is judicially estopped from asserting an inconsistent position now. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). Furthermore, Edwards's position on appeal contradicts an undisputed fact set forth in the parties' pre-trial stipulation and cited by the District Court in its 2006 opinion: "In the fall of 1997, Wyatt owned forty-five percent of the issued and outstanding stock of Pilot, Edwards's Chapter 7 Trustee controlled his thirty-three and one-third percent of Pilot's stock and the balance was owned or controlled by Phillips . . . ." 2006 WL 2945224 at *2.

In light of the aforementioned facts, we find that the District Court erred in crediting Wyatt with having improved his position by receiving the entire value of 50% of the company; because Wyatt owned 45% prior to the breach, he realized only a net gain of 5% by breaching the Handshake Agreement. Accordingly, the District Court's inclusion of the value of Wyatt's entire 50% interest in Pilot — valued at $9,500,000[5] —

---

[5] Wyatt complains that the District Court's valuation of the company was erroneous because the court valued his 50% share when he sold his interest in Pilot to Phillips in 2003, rather than the value at the time of breach (1998). As a general rule, "[d]amages for breach of contract are to be determined as of the time of the occurrence of

17

was improper. The District Court should have included the value of just 5% of the company — or $950,000 — in determining Wyatt's economic benefit from the breach.

We find no error, however, in the other components of the District Court's calculation: payment of Wyatt's legal fees ($700,000)[6]; Wyatt's four-year employment contract ($1,200,000); and an interest in an Edwards real estate partnership ($1,500,000). *See Edwards '06*, 2006 WL 2945224 at *9. Therefore, we find that the economic benefit realized by Wyatt as a consequence of having breached the Handshake Agreement was $4,350,000. Recognizing, as we have, that 42.5% of Wyatt's benefits were attributable to Edwards's shares in Pilot and its affiliated holdings, we multiply Wyatt's benefit by

the breach." 22 Am. Jur. 2d Damages § 78 (2008); *accord Gaylord Builders, Inc. v. Richmond Metal Mfg. Corp.*, 186 Pa. Super. 101, 104 (Pa. Super. Ct. 1958). However, there was no evidence that Wyatt's shares were worth less in October 1998 or that Wyatt and Phillips's management of the company in the intervening five years substantially increased the company's value. Furthermore, we reject Wyatt's assertion that expert testimony was needed to determine the value of his shares. Wyatt has not pointed to any authority which requires expert testimony to establish the company's value, at least where, as here, a defendant is a sophisticated investor whose opinion of the value of an asset is reflected in what he was willing to pay for it, and where the fact-finder is given no reason to think that the investor's estimates did not reflect a reasonable approximation of the value of the asset at the time of the breach.

[6] We also reject Wyatt's assertion that the District Court improperly included the $700,000 he received for the payment of his legal fees. Wyatt argues that he is entitled to an offset because some of those legal fees were spent "maximiz[ing] the value of Edwards' stock." The Wyatt-Phillips settlement agreement expressly provided for the payment of Wyatt's legal fees up to that time and Wyatt has never introduced any evidence to substantiate this offset. *See Blum v. Witco Chem. Corp.,* 829 F.2d 367, 375 (3d Cir. 1987) (burden is on defendant to prove any setoffs to damages). Accordingly, we find those fees were properly included.

18

42.5% for a total of $1,848,750.  Therefore, we will vacate the judgment of $5,482,500 and remand for the District Court to enter judgment in favor of Edwards for $1,848,750.

B.

Though we find that the District Court properly awarded Edwards expectation damages, Edwards presents two arguments in support of his claim that the District Court's damages award was insufficient.  First, Edwards argues that the District Court should have included income reported on Wyatt's K-1 tax statements.  Specifically, Edwards insists that he is entitled to 42.5% of $9,106,917 — the Pilot Holding Company income attributable to Wyatt on his K-1 — for a total of $3,870,439.  We disagree.

Under the Internal Revenue Code, S-corporation and partnership shareholders pay tax on the entity income allocated to them in accordance with their ownership percentages in the year the entity received the income, *whether or not the entity actually distributed the income to the shareholder*.  26 U.S.C. §§ 702(c), 1366(c).  A partner's pro rata share of the corporation's income is reported on a Schedule K-1, but the K-1 does not show the amount of *actual* distributions that the partnership made to its partners; that information is reported on a Form 1099-DIV.  *See Shareholder's Instructions for Schedule K-1 (Form 1120S) for 2000*, page 1.  The K-1 is designed to show tax liability; the income need not actually have been distributed to the shareholder.  *See* I.R.C. §§ 1366(c) and 702(c).

In light of the purpose of the K-1, we cannot say that the District Court erred in excluding the information contained therein from Edwards's damages.  Edwards

19

introduced no evidence at trial to demonstrate what portion, if any, of Wyatt's taxable interest in Pilot Holding Company translated into real income to Wyatt. Indeed, Wyatt testified that the K-1 forms did not reflect any cash distributions from Pilot and Edwards introduced no evidence to the contrary. This is fatal to Edwards's claim that he is entitled to a pro rata portion of the income listed on Wyatt's K-1s. *See Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.3d 1336 (11th Cir. 1987) (finding that K-1 did not show lost profits with reasonable certainty, where the plaintiff did not demonstrate the relationship between a shareholder's income and the S corporation's profits as reported on the K-1). Finally, we reject Edwards's contention that *Wyatt* failed to demonstrate that the K-1s did *not* reflect income distributions as an improper attempt to shift *Edwards's* burden of proof. *See Spang & Co. v. U.S. Steel Corp.*, 519 Pa. 14, 25 (1988).

## C.

Edwards also challenges the District Court's denial of his post-trial request for prejudgment interest. *See Edwards* '06, 2006 WL 2945224, at *9 ("No prejudgement [*sic*] interest will be awarded.").

State law governs awards of prejudgment interest in federal diversity actions. *See Liberty Lincoln-Mercury v. Ford Motor Co.,* 134 F.3d 557, 574 (3d Cir. 1998). Under Pennsylvania law, the award of pre-judgment interest in contract actions is not discretionary. *See Buford v. Wilmington Trust Co.,* 841 F.2d 51, 56-57 (3d Cir. 1988)

20

(citing *Palmgreen v. Palmer's Garage, Inc.*, 383 Pa. 105, 108, 117 A.2d 721 (1955) ("In all cases of contract interest is allowable at the legal rate from the time payment is withheld after it has become the duty of the debtor to make such payment; allowance of such interest does not depend upon discretion but is a legal right."); *Verner v. Shaffer*, 347 Pa. Super. 206, 211, 500 A.2d 479 (1985) ("[I]n a contract action, the award of prejudgment interest is not a matter of discretion, but is a legal right.")). This principle holds when contract damages are liquidated or unliquidated. *See Spang & Co. v. USX Corp.*, 599 A.2d 978, 983-84 (Pa. Super. Ct. 1991). Therefore, had Edwards petitioned for prejudgment interest pursuant to *state* law, the District Court would have been obligated to award it. However, Edwards requested prejudgment interest only pursuant to *federal* law, which provides that the award of prejudgment interest is discretionary. *See Feather v. United Mine Workers of Am.*, 711 F.2d 530, 540 (3d Cir. 1983).

Edwards failed to cite the nondiscretionary state law standard before the District Court and on appeal before this Court. Accordingly, pursuant to the doctrine of invited error — which prohibits one from seeking appellate review of "alleged errors invited or induced by himself," *see United States v. Riccobene*, 709 F.2d 214, 228 (3d Cir. 1983) — we will affirm the District Court's denial of prejudgment interest. [7]

---

[7] Even if we were to review the discretionary denial of prejudgment interest under the federal standard for abuse of discretion, *see Thabault v. Chait*, 541 F.3d 512, 533 (3d Cir. 2008), we would affirm. Under *Feather*, a district court must consider four factors in determining the propriety of a prejudgment interest award: (1) whether the claimant has been less than diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; and (4) whether

21

IV.

For the foregoing reasons, we find the judgment of the District Court free of material error except insofar as it wrongly calculated Edwards's damages. We will vacate the District Court's damages award and remand with instructions to enter judgment in favor of Edwards and against Wyatt in the amount of $1,848,750.

---

countervailing equitable considerations militate against a surcharge. 711 F.2d at 540. While acknowledging Edwards's diligence throughout this protracted litigation, we find that, on the whole, these factors support a denial of Edwards's request. First, in order for Wyatt to have been "unjustly enriched," the benefit must have been conferred by the party claiming restitution (Edwards); it is not enough that the benefit was simply derived from the breach. *Id.* at 541 n.11. Furthermore, there are countervailing equitable considerations — including the abnormal length of this litigation as well as the difficulty in determining Edwards damages in the first place — that call for a rejection of Edwards's petition. Accordingly, the District Court did not abuse its discretion in denying prejudgment interest under the federal discretionary standard.